CLAFLIN and others *v.* THE SOUTH CAROLINA R. Co. and others.

*(Circuit Court, D. South Carolina. 1880.)*

1. MORTGAGORS AND MORTGAGEES.

An issue of bonds secured by a first mortgage and issued for the purpose of taking up others of a prior issue, was larger than necessary for that purpose. In a suit brought by holders of a second mortgage to foreclose their mortgage, *held,* that such surplus bonds, whether actually out and in the hands of *bona fide* holders when the second mortgage went into effect, or issued afterwards for the first time, as collateral, to secure a debt contracted at the time they were thus pledged,—in either case, they were secured by such first mortgage equally with those applied to the purpose of the issue, even though, in the second case, such pledgee had full knowledge of all the facts.

2. MANNER OF ISSUING BONDS—RE-ISSUE, RETIREMENT, AND CANCELLATION OF.

Construing the language of the instrument with reference to the surrounding circumstances and the subject-matter of the contract, *held,* first mortgage bonds remaining unissued in the hands of the company, and those which afterwards came into their hands by purchase, without the intention of retiring them, could be issued, sold, and transferred by the company, after the date of the second mortgage, so as to carry a lien under the first mortgage.

3. SECOND MORTGAGE CONSTRUED—APPLICATION OF BONDS—LIENS DETERMINED—PAYMENT OF PRIOR ENCUMBRANCES—DIRECTORS AS CREDITORS—RECORD OF MORTGAGE—LIEN OF SUBSEQUENT ATTACHMENT.

A second mortgage, made to secure the payment of an issue of 6,000 bonds, of $500 each, recited that the proceeds thereof were "to be applied exclusively to the extinguishment of the floating debt and the retirement of unsecured bonds." The manner of effecting this extinguishment was not provided for, further than by authorizing the president of the company to sell the bonds at not less than 80 per cent., which might be for one-third cash and two-thirds in unsecured bonds, at not less than 80 per cent. *Held:*

(1) In a controversy between bondholders, that bonds of this issue, even if pledged as collateral upon an extension or renewal of the floating debt, or to secure notes given in payment of unsecured bonds, were regularly issued and properly applied.

(2) Directors acting in good faith for the best interests of the company are entitled to the same rights as other creditors.

(3) Outstanding unsecured bondholders are not entitled to participate in the security of the second mortgage without first complying with the terms dictated by the company.

(4) Bonds purchased by the company with the proceeds of second mortgage bonds should be delivered up and cancelled.

(5) An attachment regularly issued in the state of Georgia is superior to the lien of a mortgage defectively recorded.

In Equity.

*Mitchell & Smith,* (of Charleston,) *Chamberlain, Carter & Hornblower,* and *William Stone,* (of New York,) for complainants.

*James Conner, A. G. Magrath, Lord & Inglesby, De Saussure & Son, Simonton & Barber, H. E. Young, B. H. Rutledge, Rutledge & Young,*

*W. D. Porter, G. R. Walker, Hayne & Ficken, A. T. Smythe, Buist & Buist, T. M. Hanckel, J. N. Nathans, M. P. O'Connor, W. A. Pringle, Joseph W. Barnwell, Charles S. Campbell, Thomas M. Mordecai, Simons & Simons, Edward Magrath, Bryan & Bryan, C. R. Miles, L. C. Northrop,* and *McCrady & Sons,* for respondents.

WAITE, Chief Justice.   This is a suit in equity by holders of bonds of the South Carolina Railroad Company, secured by what is known as the second mortgage, to foreclose that mortgage, subject to the lien of prior encumbrances.   It naturally divides itself into six parts, which, for convenience, will be considered separately.   They are: (1) The first mortgage; (2) the second mortgage; (3) the syndicate; (4) the sales of parts of the mortgaged property; (5) the attachments in Georgia; (6) the wharf property.

1. As to the first mortgage:

The original name of the South Carolina Railroad Company was the Louisville, Cincinnati & Charleston Railroad Company.   In that name, and under the authority of an act of the general assembly of South Carolina, passed December 12, 1837, the company issued bonds, payable part in London and part in Charleston, to the amount of £450,000, which fell due January 1, 1866.   The payment of these bonds, principal and interest, was guarantied by the state, and secured by statutory mortgage to the state on all the property and funds of the company in South Carolina.   The name of the company was changed in 1843, and thereafter it was known as the South Carolina Railroad Company.   In 1865 it became apparent that these bonds could not be met at maturity.   Accordingly the general assembly of the state, on the twenty-first of December, 1865, passed another act, petitioned for by the company, authorizing the issue of other sterling bonds for the principal and interest of the first, and to be substituted for them.   As the substitution was made the new bonds were to be guarantied by the state, and this guaranty was to have the effect of continuing the original statutory mortgage in force the same as if no change had been made.   Some exchanges were effected under this authority, but, on the whole, the scheme was a failure.   In addition to the bonds thus put out, the company was in debt for other bonds, issued in 1849, amounting in all to $175,000, which were to fall due, some on the first of January and some on the first of October, 1868.   Under these circumstances, after negotiation with the bondholders, it was—

"Deemed advisable, for the better securing of the said debts, that all the said bonds should be delivered up and cancelled, and new bonds issued in substitution thereof; the payment of said bonds to be secured by a mortgage to trustees of the estate, real and personal, of the * * * company, including therein all the real and personal property * * * situate within the limits of the state of Georgia, and not included in the statutory mortgage created by the act of 1867."

Thereupon the company—

"Resolved to execute its bonds, payable in London, for an amount not exceeding in the aggregate the sum of £543,500, * * * to be dated on the first day of January, A. D. 1868, and to be payable to bearer, with interest thereon at the rate of 5 per cent. per annum, payable semi-annually, * * * on the presentation of the proper coupons at the office of Messrs. Dent, Palmer & Co., in the city of London, * * * which said bonds shall be substituted for the sterling bonds now outstanding and payable in London."

The company also—

"Resolved to execute certain other bonds, not exceeding in the aggregate the sum of £76,500, * * * to be dated on the first day of January, A. D. 1868, and to be payable to bearer, with interest at the rate of 5 per cent. per annum, payable semi-annually, * * * on the presentation of the proper coupons at the office of the * * * company, in the city of Charleston, * * * which said bonds shall be substituted for the sterling bonds * * * payable in Charleston."

It was also—

"Resolved to substitute for the bonds issued in the year 1849, and payable in currency of the United States, * * * or to apply to the satisfaction of said bonds, upon such terms as may be agreed upon, the sterling bonds to be issued as hereinbefore provided for, so as to retire all the said bonds now payable in currency of the United States."

"To secure the true and punctual payment of the said bonds, * * * the company * * * resolved to pledge and mortgage to the [trustees named] all the real estate, wherever situate, which is now owned or may hereafter be acquired by the said company, and all the rolling stock and other personal property used, or necessary, in the operating of said railway."

In accordance with this scheme, bonds, with a mortgage to secure them, to the full amount of £620,000, were executed by the company, and certified by the mortgage trustees. Provision was made in the mortgage for a substitution of bonds "payable in lawful money of the United States, with interest not exceeding 7 per cent. per annum," for the new sterling bonds provided for, "upon terms to be agreed upon by and between said company and the bondholders desiring such substitution;" but the pound sterling on all payments of sterling bonds, or the interest thereon made in Charleston, was "to be estimated at four dollars and forty-four and four-ninths cents."

All the old issues of bonds have been taken up by exchange or otherwise, and cancelled, except—

(1) Guarantied Louisville, Cincinnati & Charleston sterling bonds, - . £16,050
(2) Guarantied South Carolina sterling bonds, - - - £8,000
(3) Bonds of 1849, Nos. 191, 192, 193, - - - - $1,500
(4) Guarantied South Carolina sterling bonds, pledged to E. L. Trenholm in 1870, - - , - - - - £5,400
(5) One other bond of same character, (No. 463,) - - - £600
Against this the receiver now holds bonds originally put into the hands of the London agents for exchange, and which have not been used for that purpose, - - - - £24,450
Currency bonds in the possession of and owned by the company when this suit was begun, - - - - - $2,000

It is conceded that there are now outstanding in the hands of *bona fide* holders, and entitled to the benefit of the mortgage security—
New sterling bonds, - - - - - - - £309,550
New currency bonds, - - - - - - - $1,114,000

The same is true of items 1, 2, and 3 in the statement above, showing the unretired bonds of the old issues.

It is also conceded that £620,000 was more than the old debt. If all the old bonds had been out when the new were issued, their aggregate, principal and interest, would not have reached this sum. They were not, however, all out. Some had been taken up by the company before that time; and it is apparent, from the evidence, that an issue of the whole amount of £620,000 would leave a surplus of $400,000 and more, after fully providing for what were left outstanding. All the bonds of the new issue are now outstanding except such as are held by the receiver. No questions are raised as to any save the following:

(1) Amount pledged to several creditors of the company as security for moneys loaned, outstanding in the hands of the pledgees, October 1, 1872, when the second mortgage was made, - $114,000
(2) Amount pledged to C. H. Manson as security, January 19, 1877, $20,000
(3) Amount pledged to B. F. Moise, agent, January 15, 1874, - $4,500
(4) Amount of sterling bonds pledged to George W. Williams as security, May 14, 1874, - - - - - £18,000
(5) Amount of loose coupons cut from bonds pledged to George W. Williams, and past due when the bonds were sold under the pledge, - - - - - - - $3,675
(6) Nine guarantied South Carolina Railroad bonds, of £600 each, issued under the act of 1865, and pledged to E. L. Trenholm as security for money loaned, April 2, 1870, - - - £5,400
(7) One bond of same character, being No. 463, pledged to the syndicate, - - - - - - - £600

. The date of the second mortgage is October 1, 1872.

Upon this state of facts several questions are raised which will now be considered. And, *first*, it is insisted that the company could not issue under this mortgage any bonds not actually used in taking up or retiring the old ones. The argument is, that the mortgage is in legal effect a contract between the company and the bondholders, by which it was agreed that no bonds were to have the benefit of the security thus created, except such as were substantially "substituted" for the earlier issues. I am unable to discover any such contract. The mortgage purports to be made to secure bonds of certain descriptions, not exceeding in the aggregate £620,000. It recites other bond indebtedness secured by prior liens, and that the new bonds were to be substituted for the old. This may, and I think does, confine the lien of the new mortgage to an amount which, added to the prior specified encumbrances, shall not exceed the limit fixed, but that is all. Every bondholder can insist that the entire issue shall not exceed this sum, and every subsequent encumbrancer that the lien of the bondholders shall be correspondingly restricted. That this was the understanding of the company no one can doubt. As early as January, 1871, the treasurer, in a report to the stockholders, took occasion to refer to the surplus of these bonds, which he estimated at $450,000, and to say that if they could be disposed of at their value the finances of the company would be greatly relieved. At this time one, at least, of the trustees named in the mortgage was a director in the company, and soon afterwards the issue of the surplus bonds, as collateral or otherwise, was commenced without objection from any one. As between the railroad company and *bona fide* holders of bonds certified in due form by the trustees, and purporting to be issued under the mortgage, there can be no doubt as to the lien. The company is estopped from denying that the bonds it has actually put out are what they purport to be. None of the first mortgage bondholders complain. So far as appears they are satisfied with the security they have got. The second mortgage covered only the equity of redemption which the company then had in the mortgaged property. Whatever bound the company then as to the extent of the mortgage lien within its limit of £620,000, bound the second mortgage bondholders. It follows that to the extent the bonds were actually out, and in the hands of *bona fide* holders, when the second mortgage was executed, there can be no question as to their priority.

It is next claimed that the first mortgage bonds which are held in pledge as security for the notes of the company have no priority over

the second mortgage. So far as this objection relates to the bonds held by the defendants Middleton, De Saussure, Andrew Simonds, Rose, and Drayton, pledged and in the hands of the present holders before October 1, 1872, it is disposed of by what has already been said. They were all actually issued under the mortgage and accepted as such. This the company will not be permitted to deny; neither can the second mortgagees. No one has ever supposed that a taker of negotiable paper, as collateral security for a debt contracted at the time, was not a holder for value. It follows that to the extent necessary to secure the debts due these defendants respectively, the lien of the bonds they severally hold is good. The same is true, also, I think, of the bonds held by the defendant Manson. The master has reported that these bonds were pledged after the second mortgage went into effect, and to secure a debt contracted at the time of the pledge. To this part of the report an exception has been filed. In my view this question is unimportant; but having looked into the evidence I am satisfied the exception is well taken. The bonds were out on pledge when the second mortgage was made, and the evidence leaves no doubt in my mind that the present debt in the hands of this defendant is, in legal effect, a continuation of the old one with the original pledge transferred. This exception to the report will therefore be sustained, and the pledge classed among those outstanding October 1, 1872.

As to the bonds for £18,000, pledged to the defendant George W. Williams, it is conceded they were not and never had been out of the control of the company when the second mortgage was made. They were executed and certified in proper form as bonds secured by the mortgage, and on the ninth of July, 1868, sent with others to the company's agents in London to be exchanged for old sterling bonds payable there. During the year 1874, when it was found they would not be needed to take up the old bonds, the company gave them in pledge to Williams, by whom they are now held, his note having been renewed from time to time until the commencement of this suit.

Soon after the report of the treasurer, in 1871, which has already been alluded to, the use of the surplus bonds as collateral was begun, and it is safe to say that, between that time and the date of the second mortgage, all except those in the hands of the London agents had been put out in that way. None had ever been actually cancelled, but all were kept on hand to be used as wanted. The second mortgage trustees might have required all on hand when the second mortgage was made to be retired, and the lien of the first mortgage con-

fined to those already out. This, however, they did not see fit to do, and consequently the rights of those they represent depend on the effect to be given the instrument they took; and in this, as it seems to me, the intention of the company to keep the first mortgage on foot as a standing and continuing security, to the full extent of the originally-authorized issue, is clearly manifested. The language is "that the mortgage herein above granted shall be and continue at all times subject to the lien of the mortgage executed by the South Carolina Railroad Company to Henry Gourdin, H. P. Walker, and James M. Calder, and to all renewals or extensions of said mortgage, or of the bonds secured thereby, to the full amount of the principal of said bonds." This, I think, means not only the principal of bonds then out but of all that might thereafter lawfully be put out under the mortgage, as well. The use which the company had been making, and which it was no doubt expected would be continued, of the surplus bonds remaining after providing for the old issues, must have been in the minds of all. One of the trustees under the second mortgage was at the time director of the company, and the idea of actually cancelling any of the old lien in favor of the new, seems never to have been suggested by any one.

The question is thus distinctly presented whether bonds then in the hands of the company, or which afterwards got there, could be issued or re-issued so as to carry with them a lien under the first mortgage as against the second. This, as it seems to me, is a question of intention to be gathered from the language of the instrument, considered with reference to the surrounding circumstances and the subject-matter of the contract. I am aware that, ordinarily, a debt once paid is extinguished, and that as a mortgage is but an incident of the debt it secures, if there is no debt there can be no mortgage. But here the point of the inquiry is whether the parties intended to apply this rule in all its strictness to the prior mortgage, about which they were contracting. Certain it is that, before the mortgage can be cancelled, the debt it purports to secure must be shown never to have been created, or, if created, extinguished within the meaning of the contract for security expressed in the mortgage. As against other bondholders secured by the same mortgage, I cannot believe there is a doubt of the power of the company to put out and keep out the entire issue up to the time the bonds become due. The contract with the individual bondholder is no more than that he shall have his due proportion of the security the mortgage on its face implies.

Railroad bonds are a kind of public funds. They are put on the

market and dealt in as such. They are treated as current until past due or actually retired. The mortgages provide for the security of the particular bonds they describe, and the company puts the bonds out from time to time as occasion requires. When a dealer finds such bonds not yet due in the hands of the company, with the proper certificate of the mortgage trustee upon them, it has, I think, always been understood in the commercial world that he might buy in good faith with safety. The security has been considered a continuing one, and the bonds negotiable by the company so as to carry the mortgage security until they have become commercially dishonored, or something else has been done to deprive the company of its power of putting them out. In my opinion a subsequent mortgage is not sufficient for this purpose, unless it in terms limits the lien of the prior mortgage to bonds actually out, and provides against re-issues. As it would be within the power of the second mortgage to require that all bonds not out should be destroyed, so as to prevent their getting on the market, it may be doubtful whether, as against a *bona fide* holder, the limitation contained in the second mortgage would be of any avail, unless the bonds themselves had been actually cancelled, or carry on their face the evidence of an extinguishment of their lien. It is so easy for one taking a subsequent lien to protect both himself and the public against loss in this particular, that, if he fails to do so, he should be treated as guilty of a commercial wrong, and made to suffer accordingly.

Take this case as an illustration. The first mortgage provides for an issue of £620,000. In point of fact the full amount was executed, properly certified, and left with the company to be put out as wanted. According to the construction I have already given the mortgage, the most one purchasing from the company need do before the making of the second mortgage was to inquire whether there was a surplus to be sold after taking up the bonds for which this issue was to be substituted. The second mortgagees voluntarily permitted the first mortgage to stand as it was. In this the second mortgage bondholders are represented and bound by their trustees. Whatever the company could do with the first bonds before, it might do after, so far as any express limitations in the second mortgage were concerned. The lien of the first to its full amount was recognized, and nothing was said or done showing directly any intention to limit the power of the company under it. Suppose, instead of a mortgage to secure bonds, it had been, under full legislative authority to that purpose, to secure a certain amount and description of notes, like bank-

notes, to be put in circulation as money. Would any one insist that, if a subsequent mortgage should be given on the same property, which was in terms subject to the lien of the first, the company would in this way be prevented from keeping its old notes in circulation, and taking them in and paying them out as before? Clearly not, I think. And why? Because the nature of the paper secured was such as to preclude such an idea. The notes were put out for circulation. They were to be used as money. When in the possession of the company they were for the time being inoperative, but as soon as they were out their attributes as notes secured by the mortgage were all restored. Such would have been the evident intent of the parties, and such, I am sure, is the effect the courts would give to what had been done.

Here the bonds put out, while not for circulation as money, were intended as articles of commerce, to be bought and sold in the market, and passed from hand to hand as current negotiable securities. They were to be used in trade. When in the hands of the company their lien under the mortgage was suspended; but the moment they were out in the usual course of business, it again took effect as of the time the mortgage was given. Any other rule than this would materially impair the marketable value of this class of instruments, and tend to defeat the very object of their execution. The whole issue of such bonds must be treated as of the date of the mortgage, without regard to the time they were actually put out, unless the contrary is clearly expressed.

As Mr. Williams took the bonds direct from the company at a time when he was himself a director, he is charged with notice of the facts. His lien, therefore, would not be good as against the second mortgage if the company had not the power to use them as it did, and transfer a corresponding interest in the mortgage. As I think, it had that power. The bonds were not due, and had not, commercially speaking, been retired or extinguished. It follows that to the extent necessary to secure the note for which they are held, they are entitled to the benefit of the lien created by the terms of the mortgage.

The 210 loose coupons held by Mr. Williams as collateral were cut from bonds pledged to him December 4, 1872. The original loan made at that date was continued by various renewals until 1878, when the bonds, with the matured coupons cut off, were sold, and the proceeds applied to the payment of the debt. A part of the debt still remains unsatisfied, and the coupons cut off are unpaid. I see no reason why they may not be enforced as valid claims under the

mortgage. What I have said in respect to the other pledges is equally applicable to this. The same is true of the bonds held by the defendant Moise. There is no dispute as to the debt he holds, or the fact of the pledge in good faith before this suit was begun, and before the bonds were due.

The next questions presented are those connected with the guarantied South Carolina Railroad bonds, issued under the act of 1865, 10 in number, and £6,000 in all. Nine, of £600 each, are held by the syndicate as collateral to a note of the company to E. L. Trenholm, and the other is also held by the same parties under the general arrangement, which will be considered hereafter. The facts are these: In 1866 the company had in some way got to be the owner of a considerable amount of the old Louisville, Cincinnati & Charleston bonds. For these were substituted an equivalent amount of bonds guarantied by the state under the act of 1865. All the substituted bonds were afterwards put out by the company, so as transfer the absolute ownership, except the nine pledged to Trenholm. These were given to him in 1870 as collateral to a loan or loans then made. The original note given for the loan was renewed from time to time, Trenholm still retaining the pledge, until it was purchased by the syndicate, by whom the note and collaterals are now held. I have no doubt that bonds guarantied by the state under the act of 1865, and actually substituted for a like amount of the issue under the act of 1837, bound the state and the company so as to carry with them the statutory lien, whether issued in lieu of bonds before owned by the company or not. When the company got the guaranty, it could do with the new bonds what it pleased. If actually exchanged for bonds of 1838, and the old bonds taken up and cancelled, they could be negotiated, if they had the guaranty of the state on them, so as to carry the statutory lien which the guaranty brought into operation. The first mortgage did not of itself vacate that lien. When a first mortgage bond was actually put out in place of the old one, the lien under the mortgage was substituted for that of the statute. Since the aggregate of the statutory and first mortgage liens cannot exceed £620,000 of principal debt, it is of no consequence to the second mortgagees whether the bonds ahead rank as one or the other of the acknowledged prior securities. The company was under no obligations to take up the old bonds and put out the new. So long as there were no more out in the aggregate than the second mortgage contemplated, there could be no ground of complaint. It has been suggested that the first mortgage was not to be used until the holders of

the four-fifths of the old bonds had signified their assent to the scheme of substitution, and that this assent was not secured until 1871. If that be so, then these bonds were used with Trenholm before they could be properly exchanged. But, however that may be, I am satisfied that the pledge could lawfully be made at the time it was, and that, when made, it transferred as part of the pledge the lien which pertained to the bonds put out. This made Trenholm a holder for value, and his *bona fide* title protects all who claim under him, whether they be innocent or not. This is an elementary principle in commercial law. These bonds, therefore, to the extent they are required to pay the Trenholm debt, are to all intents and purposes part of the prior lien, subject to which the second mortgage is taken, and to which it is asked the sale may be made.

As to guarantied bond No. 463, issued under the act of 1865, it was bought by the company in the market before due as an investment. It is clear from the evidence that the company never intended by this purchase to retire it from under the mortgage, but to keep it alive for future use if occasion might require. It was pledged to the syndicate under the agreement which will be considered further on. As it was out, in fact, when this pledge was made, the title of the syndicate is good under the principles which I have just stated. There is a claim of an overissue, however, and as it seems to be conceded that the other securities, if sustained, will be more than sufficient to satisfy any balance that may be due that association, I think the injunction against the negotiation of this bond should be continued in force until such time as it shall be found whether there has been an overissue, or, at least, until it shall be found that the other securities will not pay the debt.

As to the alleged overissue, it is sufficient to say that the case is not now in a condition to enable me to determine that fact. I have already shown that the mortgage is valid to the extent of £620,000. The bonds now out on hypothecation by the company are understood to be more than sufficient to pay the debts for which they are held. In legal effect the amount thus issued is no more than is required for the purposes of the security. The receiver has now in his hands $2,000. Those bonds may now be retired and cancelled. It will be sufficient for all the purposes of this case to order a sale subject to a prior lien in this behalf, not exceeding £620,000 as the principal sum. The difference between that amount and the actual bonds outstanding will not be sufficient to materially affect the sale, and it will be time enough to consider what shall be done with any excess

of issue there may be, when it becomes necessary to enforce the earlier liens.

This, I believe, disposes of all the questions presented under this branch of the case except as to the coupons taken up in 1877, and January, 1878, by the syndicate. These will be considered hereafter.

2. As to the second mortgage:

At a meeting of the directors of the company, May 21, 1872, the following resolutions were adopted:

Resolved, As the sense of this board, that some measure of relief for the large and oppressive floating obligations of the company, incurred for valuable improvements, and for acquiring controlling interests in important connecting railroads in danger of passing into unfriendly hands, has become expedient; and, further, that some means of providing for the annually-recurring bond maturities should be devised; therefore, be it—

Resolved, That a second mortgage be authorized to be created upon the properties of the company to the extent of three millions of dollars, ($3,000,000;) that bonds to that amount under said mortgage be executed, to run 30 years, bearing 7 per cent. interest, payable in semi-annual coupons, first of April and first of October, in the city of New York; and whereas, it is a duty we owe to the stockholders in putting a final mortgage upon their property to take every necessary precaution to secure to them the utmost value of the bonds to be issued under the said mortgage, and thereby to accomplish the end proposed, namely, the relief of the company's finances; therefore,—

Resolved, That the president be authorized to sell the said second mortgage bonds at not less than 80 per cent.: provided, nevertheless, that he shall take payment for the same in the following manner, viz.: one-third in cash and two-thirds in the unsecured bonds of the company at not less than 80 per cent., when these terms of payment shall be tendered.

At the same meeting it was voted that the privilege of making payment for second mortgage bonds by one-third in cash and two-thirds in non-secured bonds, should extend for one year from the date when the bonds should be prepared for sale, and the proceeds of the bonds should be applied exclusively to the extinguishment of the floating debt and of the unsecured bonds. The floating debt at this time amounted to something more than $1,000,000, and the unsecured bonds to $2,000,000. In accordance with these resolutions, a mortgage, and bonds of $500 each, amounting to $3,000,000, were executed. The mortgage recited the substance of the resolution of the directors, and especially that the proceeds of the bonds "were to be applied exclusively to the extinguishment of the floating debt and the retirement of said unsecured bonds." Of the new bonds it is conceded that 2,269, amounting to $1,134,500, were regularly

issued, and are entitled to the full benefit of the mortgage security. Twenty-three, equal to $11,500, are now in the hands of the receiver, subject to the orders of the court, and can at any time be cancelled and retired. The rest are disputed, principally on the ground that, instead of being used to *extinguish* the floating debt and *retire* the unsecured bonds, they were pledged to the floating-debt holders as collateral security, whereby the debt was perpetuated rather than got out of the way. For this reason it is contended that the bonds so held are not entitled to an equal lien under the mortgage with those issued so as to bring about an actual extinguishment of old debts.

This makes it necessary to determine what bonds the mortgage really does secure. The controversy is between the bondholders, as to the extent of their respective rights, and, for the purposes of this part of the case, it may be admitted that if bonds in the hands of first takers or their assignees with notice were not regularly issued, their right to the benefits of the mortgage may be disputed by the other parties interested in the security.

The mortgage is not to the unsecured bondholders, or floating-debt holders, or to trustees for their security. It was made to secure bonds, the proceeds of which were to be applied to extinguish the one class of debts and retire the other. The mode in which this was to be done is not provided for. · All that is left to the discretion of the company or its officers. No creditor can demand the bonds upon such terms as he may dictate. He must submit to what the company requires, or get no advantage from what has been done. His specific rights under the mortgage all depend on the bargain he makes with the company in that behalf. He may, if the company consents, exchange his claims for bonds, dollar for dollar, or less, or more; but until some arrangement has been made by which a bond secured by the mortgage becomes in some way connected with the unsecured bonds he owns, or the part of the floating debt he holds, he remains just where he was before the mortgage was made.

The original plan was to dispose of the bonds, to be paid for in part by unsecured bonds and part cash. In this way, unsecured bonds would be actually retired by the transaction, and money obtained which could be used to pay the floating debt. At first the sales were at 80 per cent., but afterwards at 75. The original time limited for taking advantage of this offer was one year, but this was extended. This plan was only partially successful. About $670,000 of the unsecured bonds are now out, and but little money was actually realized with which to take up the floating debt. In the then financial condition

of the country it seems to have been impossible to dispose of the second mortgage bonds on favorable terms, and to gain time the expedient was resorted to of extending the debt, and pledging the bonds as collateral.   In this way it seems to have been supposed that temporary relief could be obtained until the bonds could be sold or converted at more satisfactory rates.   In effect, the company said to the creditor:

"Your debt is due; we have not been able to sell our bonds, and therefore cannot pay now, but if you will give us time, we will secure you with the bonds.  If before the debt matures again we can sell the bonds, you shall have the proceeds; but if we cannot, you will have the security, which you can sell and get your money."

It is impossible to say that this is not an application of the bonds, having for its object the extinguishment of the particular debt to which they were attached.   If before the debt was due the company had itself sold the bonds, and with the proceeds paid what it owed, the application, it is conceded, would have been in exact accordance with the provisions of the mortgage, and this whether the bonds were disposed of at a greater or less price.   I am unable to see any difference, so far as the mortgage is concerned, whether the sale is made by the creditor under the authority of the company, or by the company itself.   In either case the proceeds of the bonds are applied to the extinguishment of the debt.   As much may not have been accomplished as was hoped for, but the application that has been made is completely within the scope of the mortgage.

Another class of cases reported to the master shows even more pointedly the propriety of this construction.   The unsecured bonds were from time to time falling due.   Some of the holders were not willing, and perhaps not pecuniarily able, to accept the terms of exchange that were offered, but they were willing to surrender the obligations they held and take a note of the company for the amount due, payable at a future date, with second mortgage bonds as collateral.   Some of these propositions were accepted, and the notes with bonds pledged are now out.   The old bonds have been retired by the use of the new.   There was no actual exchange of bonds, but the new bonds were put in the way of being applied to pay for the old ones.   All this, as it seems to me, is within the scope of the mortgage.   It may not have been judicious management, but it was within the discretion of the company.   The only contract with the individual bondholders is that the mortgage security shall not be diverted from its designated uses.   That bonds sold under a pledge to secure an old debt

carry with them the mortgage, cannot, as I think, admit of a doubt. That being so, it is difficult to see how the pledgee, before sale, can be in a worse condition than a purchaser.

Coming now to the consideration of the particular cases, I find that they may properly be divided into four classes:

(1) Debts actually owing at the date of second mortgage, October 1, 1872; (2) notes for unsecured bonds, actually taken up and retired; (3) debts bearing date after October 1, 1872; (4) debts connected with the purchase of certain securities of the Greenville & Columbia Railroad.

As to the first and second classes, nothing need be added to what I have already said. They include all the cases embraced in schedules 7 and 8 of the master's report.

As to the third class, which includes the cases found in schedule 8, while they are, apparently, debts contracted after the second mortgage, I think they are, in reality, only a continuation of those which existed before. The floating debt seems to have been, for a long time, a continuing thing. The amount now owing is subtantially what it was when the mortgage was made. The creditors have changed, but not the debt. One note has been paid, directly or indirectly, by putting out a new one. It may not be possible, in all cases, to tell whether a debt to one was paid directly with money borrowed from another, but it is certain that, from a fund made up in part from new borrowings, old loans have been cancelled. The object of the mortgage was to extinguish the existing debt. This is not done by simply changing the creditors. It may be true that the plan adopted by the company has, in fact, perpetuated the debt instead of extinguishing it, but it is clear that extinguishment was contemplated by what was done. If, in the end, the debt had been cancelled by the use of the bonds in this way, there can be no doubt that the lien of the bonds so used would be good. I cannot believe that the pledgee loses his rights simply because the plan has proved a failure.

As to the fourth class, the evidence shows that, before the execution of the mortgage, the South Carolina Railroad Company had, by the use of its unsecured bonds or otherwise, become the owner of a controlling interest in the stock of the Greenville & Columbia Railroad Company. The restrictions under which the mortgage was created represent that the large and oppressive debt of the company was incurred, in part, "for acquiring controlling interests in important connecting roads, in danger of passing into unfriendly hands." The Greenville & Columbia road was an important feeder to the South Carolina Company. It owed a large debt to the Commercial Ware-

house Company, of New York, for which valuable collaterals were pledged; and, besides, there was danger that if the debt was not paid the company would be put into bankruptcy. It was believed that such a result would be disastrous to the interests of the South Carolina Company. For this reason the South Carolina Company seems to have treated the debt of the Greenville & Columbia Company as its own, and given its own notes to the warehouse company, secured by second mortgage bonds as collateral. This, I think, is fairly within the scope of the mortgage. While, nominally, the debts of the two companies were distinct, the South Carolina Company was as deeply interested in saving the Greenville Company from bankruptcy as that company could be itself. As the new bonds were made to take care of the debt incurred in buying the stock of this company, I cannot but think their lien should be sustained. In addition to this, it appears that these bonds were first put out under this pledge February 19, 1873,—only a few months after the second mortgage. From that day until the commencement of this suit no complaint has been heard from any one. During all this time one of the mortgage trustees was a director of the company. Many of the bonds have been sold under the pledge, and it is now too late to complain of their use or dispute their lien. In all matters affecting their security the bondholders are charged with the knowledge of their trustees. For the purpose of protecting their interests under the mortgage, the trustees are their agents.

Without pursuing this branch of the case further, it is sufficient to say that I am of the opinion that the holders of all bonds now out on pledge by the company are entitled to their proportionate share of the security of the mortgage, to the extent that may be necessary to pay the debts for which they are respectively held, and that all bonds sold under pledges carry their lien with them to the purchaser.

The only question in this part of the case which remains to be considered is as to the rights of the outstanding unsecured bondholders under the second mortgage. It is insisted in their behalf that the mortgage—

"Was a contract between the corporation and its creditors, and constituted a complete and executed trust for the creditors of the company then holding its open and unsecured bonds and its floating debt, for the retirement and extinguishment of which the bonds secured by said deed were to be exclusively applied."

From what I have already said it must be apparent that I cannot agree to this position. Whatever else the mortgage may be, it

is certainly not an assignment for the benefit of these two classes of creditors. Neither, as I have before stated, was it intended in any manner for their security, so long as they hold their unsecured bonds or floating debt unaffected by any contract they may make with the company with reference to it. They can only get what they especially bargain for. Neither can they compel the company to make any particular arrangement in their behalf. The company is at liberty to make its own terms. The terms it once offered, the owners of the bonds now outstanding declined to accept. The bonds have since been used. To the extent of their rights under the mortgage, they carry to the present holders the security that has been appropriated. It is now too late for others to come in for what is left, if there should be anything. Such others must be content to remain, as they always have been, unsecured creditors of the company.

3. As to the syndicate:

All the questions connected with this part of the case have been disposed of by what has already been said, except those connected with the coupons of the first and second mortgage bonds taken up in New York and Charleston, and the attachment proceedings in Georgia. In respect to the coupons, the first inquiry is whether they were bought by the syndicate, or paid by the company with money advanced for that purpose by the syndicate.

In the early part of 1877, the finances of the company were found by the directors to be again in an embarrassed condition. In some cases interest on the bonded debt had not been paid promptly at maturity, and there was danger of a general suspension unless relief could be obtained. The credit of the company was impaired and the available collaterals mostly in use. Under these circumstances, certain of the wealthy and influential directors of the company associated themselves together for the purpose of giving the necessary help. This association is known in the pleadings as the "Syndicate." They agreed with the company to use their personal credit, either by loans, guaranties, or indorsements, to an amount not exceeding $200,000, in arranging for maturing coupons, interest on bills payable, and such other necessary debts as might mature up to and including January 1, 1878. In consideration of this the company pledged as security all the collaterals it could control, and assigned the current future income as it accrued. In respect to the coupons the provision was as follows:

"And it is further understood and agreed, that all coupons of the bonds of the South Carolina Railroad Company, which may mature up to and including

the first day of January, 1878, shall be purchased by such certain members of the board of directors hereinbefore set forth, or any one or more of them who may make advances for that purpose; and that upon their said purchase the said coupons shall be held, kept, and retained by such certain members of the board of directors as may purchase the same, as security for the amounts advanced for such purchase, and the coupons so purchased shall remain in the hands of such certain members of the board of directors, or their agent, who shall be entitled to all the rights, liens, and priorities which may appertain to the same, and to the remedies which can or may be maintained and enforced thereon agaist the said South Carolina Railroad Company."

In respect to this part of the agreement, as reduced to writing and executed by the president in behalf of the company, it is insisted that it does not follow the instructions of the directors as contained in their resolutions conferring authority on the president in that behalf, and is not, therefore, binding on the company. While the original resolution may not have contemplated precisely such a contract as this, the evidence shows that the agreement, as drafted, was presented to the finance committee of the board, and approved. After that it was executed. The company does not object, but, on the contrary, insists that it be carried into effect. Under these circumstances the present complainants are in no condition to insist that the agreement, as signed, is not actually binding on the company.

That as between the company and the syndicate the coupons were bought, not paid, I think is clear. The argument to the contrary is based upon a misconception of the evidence contained in the books of the syndicate. These books have been treated by the counsel for the complainants as though they had been kept between the company and the syndicate, whereas they are in fact the books of the treasurer of the syndicate, in which are kept all the accounts of that association. The transactions are all entered as with cash; one side of the journal showing receipts and the other disbursements. Thus the first entry on the journal shows a demand loan made by the syndicate from the People's National Bank, consisting of the check of that bank on the Bank of New York for $20,000, and premium thereon, $50; in all, $20,050. On the other side it appears that this check was sent to the National City Bank, of New York, to purchase coupons due April 1st. The railroad company was in no way connected with this transaction. The money was borrowed by the syndicate on its own obligations, and sent to the City Bank, not for the credit of the company, but to buy the coupons. Next in order on the journal is a charge of certain notes, or bills payable, made by the syndicate to raise money on. The company had nothing

to do with these notes, and was in no manner whatever bound for their payment. On the other side of the account is found the amount paid for the discount of these notes. In this way is shown the proceeds of the notes made available for the use of the syndicate. On the other side of the journal is then shown the use made of the fund thus obtained. Among other things, the demand loan at the People's National Bank is taken up, and $20,-000 loaned the company. For this loan to the company the bills-receivable account shows that the note of the company was taken. With the rest of the proceeds coupons were bought. These coupons were held by the treasurer of the syndicate as his vouchers for the note to that extent of the funds in his hands, and were charged in the coupon account of the syndicate. The company had nothing to do with this, and no charge is made against it on the books for any such use of this money. The same will be found true of all the other entries. When money was advanced to the company a corresponding entry is, as a rule, found in the bills-receivable account. Thus, when preparations were made for taking up the sterling coupons, payable in London, the money was advanced to the company and remitted to the agents in London. For these amounts the notes of the company were given to the syndicate. In this way the money was provided to *pay* the London coupons—not to buy them. Those coupons, when taken up, were extinguished, and no claim is made for them. They do not and never have appeared in the coupon account of the syndicate. The vouchers held for that advance were the notes of the company. It is not claimed that any coupons were bought except in New York and Charleston.

The books are in reality between the syndicate and its treasurer, and show in what way he has disposed of the funds in his hands. He is, in effect, charged with certain amounts of money, and his books show how it has been disbursed. On settlement he produces, as his vouchers, interest and expenses paid, coupons bought, and bills receivable belonging to the syndicate, consisting of the notes of the company taken up from others, or given for money advanced. It is an error to suppose that all the money charged to him was got from the company, or that all he paid out was either advanced to or charged in account against the company.

The next question is whether, as between the bondholders and the syndicate, the coupons were bought or paid. I shall not undertake to recapitulate the evidence on this point, but content myself with saying that the evidence, as I think, brings the case clearly within

the rule laid down by the supreme court in *Ketchum* v. *Duncan*, 96 U. S. 659. Certainly, there can be no claim of bad faith on the part of the syndicate. In Charleston full as much notice was given that the coupons were bought as was shown in the *Ketchum Case*, and while there was no such notice in New York, the payments were made in a somewhat unusual way, and no one took the trouble to inquire why. I cannot but think that, but for a misinterpretation of the books of the syndicate, this defence would not have been made. The arrangement with the syndicate was, in every respect, fair and honorable. All the members of the association were directors and members of the finance committee of the board. They were to be paid nothing for their services or the risks they assumed. So far as appears they were in no condition to be personally benefited by what was done; and in all the mass of testimony not a word is to be found reflecting on their integrity in the matter. There is nothing whatever in the case to show that the transaction was anything else than a laudable effort on the part of the directors to tide the company over what was supposed to be but a temporary embarrassment, brought about by an unexpected falling off of business, with the hope that, upon a revival of business, a disastrous failure might be avoided. The bondholders have lost nothing. The money they got when they gave up their coupons is certainly worth as much as their security under the mortgage would be to them now.

But it is still further contended that if the coupons were in fact bought, they have since been paid. This might be true, if, as has been assumed, the coupons were charged in general account against the company, and the payments made from time to time by the company applied to the satisfaction of the several items of charge in the order of their entry; but, as I have already shown, the transaction between the parties never took that form. The syndicate bought the coupons, and has never charged them in account against the company. They were originally taken, and are still held, as coupons. When money was advanced the company's note was taken, or something equivalent done. No general charge in account was made. As moneys were paid by the company they were credited at large, without any specific application. In this way, at the end of the year, when the contract expired, a large amount stood in open credit to the company. The parties then met and made their adjustments. The credit at large was all exhausted by its application to other purposes than taking up the coupons. This the parties were at liberty to do. From the books it is apparent that the application was actu-

ally made and carried into full effect long before this suit was begun. The coupons have never been taken up by the company or cancelled, and there is no rule of law which requires that any moneys which have been paid by the company to the syndicate should be applied to their satisfaction, as against what has been done by the parties. The evidence leaves no doubt on my mind as to what the parties have done.

I see nothing in the reports of the directors to the stockholders to estop the syndicate. It is true that all the members of the syndicate were directors, and no. doubt cognizant of what the report contained. No one could have been deceived by the accounts as stated. Evidently they were intended to show the results of the business of the year. At once the stockholders referred the report to a committee, which reported, on the tenth of April, that the syndicate had raised the money to take care of the interest, and were "protected by holding the coupons so taken up." Before the meeting was held to which this report was made, the default had occurred in the payment of interest on the second mortgage, by reason of which this suit was brought.

I think, therefore, that the syndicate cannot be required to refund the money paid by the receiver under a former order in this cause to take up their first mortgage coupons, and that they are entitled to the benefit of the mortgage security applicable to those of the second mortgage, which they hold. If these coupons are not paid in full from the proceeds of the mortgage security, the balance will become part of the general debt against the company, for which the other collaterals were pledged under the original agreement. The assignment of the income of the road was vacated by the receivership, under which the possession was taken for the benefit of the second mortgagees.

The question of the attachment by the syndicate in Georgia need not be considered, as it was conceded on the argument that, if the pledges which the syndicate held were sustained, the attachment need not be enforced.

4. As to sales of parts of the mortgaged property:

So far as the trustees of the mortgages have sold the property and invested the proceeds, the securities they hold in lieu of the property are subject to the order of the court, and may be dealt with as the circumstances require. If, as is stated, a part of these securities consists of first mortgage bonds, it is proper that they should be delivered up and cancelled. Such an investment is equivalent to a

substitution of the bond for the property, and an extinguishment of the mortgage lien to that extent.

In the present condition of the case, no decree can be rendered against the trustees for moneys in their hands, or which have been misappropriated. They have never been called on to answer, and there are no allegations whatever against them. It will be time enough to consider their liability when proceedings in that behalf shall have been instituted in some appropriate form.

As to property sold and conveyed by the trustees of both mortgages, the lien of the mortgages is gone, and the title of the purchasers good. In respect to purchasers who have no conveyances from the trustees, the case is in no condition for a decree under the present pleadings, and, with the present parties, all that can be done is to order a sale of the property not actually conveyed by the second mortgage trustees, leaving the purchasers to such remedies as they may have.

5. As to the attachment by the People's Savings Bank in Georgia:

After the great length to which this opinion has already been extended, I am not inclined to consider this question in detail. The conclusion I have reached is that the lien of the attachment is superior to that of the mortgage in Georgia. The first record of the mortgage in that state was not good as against attaching creditors, and it is not pretended that this bank was not at liberty to pursue such remedies as the law gave for the collection of debts. As the amount is comparatively small, and it is better to have the property sold free of such a lien, I think an order should be made directing the receiver to pay any balance that may remain due after the funds reached by the process of garnishment and not actually paid over to the receiver have been applied, as far as they will go, to the satisfaction of the judgment that has been rendered in this action in the Georgia court.

6. As to the wharf property in Charleston, which is subject to the lien of certain special mortgages:

There is no dispute about the priority of the lien of the special mortgages on this property, or as to the amount which is due. The decree should order a sale subject to these liens, and providing that the purchaser should not by his purchase become personally bound for the payment of any balance of the debt that may remain after the mortgaged property is exhausted, if he should not desire to pay off the encumbrances and keep the property.

At the close of the argument it was suggested that a reference ought to be made to determine what property was covered by the lien

of the second mortgage. There is nothing in the case as it now stands to enable me to determine as to the necessity for such an order, or whether if made at all it should be before a sale. That question is therefore left open, to be settled when the details of the decree shall come up for consideration.

A decree may be prepared in accordance with this opinion. The complainants are entitled to a sale of the mortgaged property, subject to the ascertained prior encumbrances, but until such a decree is prepared the injunction heretofore issued in this cause shall remain in force.