CENTRAL TRUST CO. OF NEW YORK v. LOUISVILLE, ST. L. & T. RY. Co. (NICHOLS et al., Interveners. Two cases).

Nos. 6,345, 6,346.

(Circuit Court, D. Kentucky. October 1, 1895.)

1. CONSTRUCTION CONTRACT—INTERPRETATION—ENGINEER'S ESTIMATE.
      The provision in a construction contract that, when the work is completed, there shall be a final estimate made by the engineer of the quantity, character, and value of the work, agreeably to the terms of the contract, and the balance, after deducting monthly payments, and on the contractor's giving a release, will be paid in full, is not an agreement that the engineer's estimate shall be conclusive.

2. RAILROADS—MORTGAGES—MECHANICS' LIENS—PRIORITIES.
      Act Ky. March 27, 1888, giving a lien for construction of a railroad, and declaring that "said lien shall be prior and superior to all other liens theretofore or thereafter created thereon," makes a lien for construction of the road superior only to other liens created after passage of the act; and where, before that time, a trust mortgage to secure a certain number of bonds was executed and recorded, and the bonds were executed and certified by the trustee, the lien of the mortgage, as to all of the bonds, including those issued after the passage of the act, was superior to the lien for construction.

Suits by the Central Trust Company against the Louisville, St. Louis & Texas Railway Company for foreclosure of mortgages. Heard on demurrer to intervening petition of Nichols, Watkins & Co., and others.

Butler, Stillman & Hubbard and Pirtle & Trabue, for plaintiff.
J. D. Atchison and Humphrey & Davie, for interveners.

BARR, District Judge. This intervening petition claims that the railway company on the 23d of July, 1892, made a contract with H. M. McCracken, who agreed to procure the necessary right of way for an extension of its line from its terminus at West Point, at a place called Howard, across to a junction with the Louisville & Nashville Railroad; and also agreed to erect a bridge across Salt river. McCracken was to construct and complete said extension to the Nashville Railroad, and get therefor, from the railroad company, $25,000 of its first mortgage 6 per cent. bonds, and $25,000 of its capital stock, for each mile of road thus constructed. On the 6th of October, 1892, McCracken entered into an agreement with the interveners Nichols, Watkins & Co., to construct, in a substantial and workmanlike manner, to the satisfaction and ac-

ceptance of the engineer in charge of the same, all the grading, clearing, grubbing, masonry in culverts and bridges, trestlework, pile-driving, riprap, on the extension from Howard of the said defendant's railway. In said contract the specifications and price of the work are given, and among other provisions are these:

"(20) * * * During the progress of the work, and until it is completed, there shall be monthly estimates, made by the engineer in charge, of the quantity, character, and value of the work done during the preceding month, or since the last monthly estimate, 90% of which value shall be paid the parties of the first part on or about the 20th day of each month, in this manner,—that is, paid under such regulations as may be agreed upon between the parties, and at such place as the party of the second part may appoint; and when the said work is completed, and so accepted by the engineer in charge, there shall be a final estimate made by the engineer of the quantity, character, and value of said work, agreeably to the terms of this agreement, when the balance appearing to be due to the said parties of the first part shall be paid to them, upon their giving a release, under seal, to the party of the second part, from all claims or demands whatsoever growing in any manner out of this agreement. (21) The monthly estimates of the engineer shall be subject to correction by him in any subsequent monthly or final estimate. The monthly estimate being merely made out as a basis of payment on account, it will necessarily be only approximately correct as to quantity and value; pains being taken, however, to make them as accurate as possible. (22) The contractor shall render an account monthly, through the proper superintending engineer, of any extra work which he may have been authorized to do; and, to prevent disputes hereafter, it is hereby understood that no bills for extra work will be allowed unless authorized and ordered in writing by the engineer in charge, and the bill for said work presented at the end of the month in which the work was done, and approved by said engineer." "(28) The word 'engineer,' wherever used in this agreement, shall be understood to mean the chief engineer. Now, therefore, in consideration of these premises, this agreement further witnesseth that the said H. M. McCracken hereby agrees with Nichols, Watkins, & Co., of the first part, that he, the said H. M. McCracken, shall and will, for doing and performing the work aforesaid well and truly, pay, or cause to be paid, to the said Nichols, Watkins & Co., of the first part, their surviving partners, executors, or administrators, the following prices, viz. [Then follows a list of the prices for the different work, and following this, as follows:] The above payments shall be made in the following manner; that is to say: [Then follows the language already first quoted herein.]"

The interveners allege that under this contract, and according to the schedule of prices therein, they have done work to the amount of $88,597.61, and also extra work amounting to $9,551.19, making a total of $98,148.80, and that there has been paid on account of extra work, $843.88, and on account of work specifically described in the contract, $47,355.86, leaving a balance due of $49,949.16. They do not allege that this amount is due according to the final estimate made by the chief engineer, but allege:

"That the chief engineer mentioned in said contract has made a final estimate of the work specifically included in the contract, and also given the vouchers for the extra work, and that through the failure of said engineer to properly measure said work included in the contract, and properly classify the same according to the terms and true intent thereof, the said final estimate and vouchers for said extra work are not as large as the true amount due to your interveners according to the terms of said contract; but, through a mistake of said engineer, he has, both in measurement and classification, made such amount to be much less than that which it correctly is, on proper measurement and classification."

The interveners claim a lien for this balance on the property of the railway under the act of Kentucky approved March 27, 1888. They allege that said railway company on the 1st of February, 1887, executed a deed of trust to the Central Trust Company, on its road which should be located and constructed from Louisville to Henderson, but provided that no extension of said road beyond the termini mentioned, to wit, Louisville and Henderson, or any branches which might be thereafter constructed, or any property or franchises pertaining exclusively to said extension of branches, should be deemed to be included in said conveyance, but same was expressly excepted therefrom, and that on the 24th of May, 1889, said railway company made, executed, and delivered a writing whereby they conveyed a branch line at Green River to trustees for same purpose, which branch was about a mile in length, and on the 23d of August, 1892, executed to said trust company another deed of trust, in which it conveyed and mortgaged, all and singular, the main line of railway and branches of said railway, as then constructed or to be constructed, from Louisville to Henderson, or its eastern terminus; also, said railway company's line of road purchased from the Louisville, Hardinsburg & Western Railway Company, from Irvington, in Breckinridge county, Ky., and Fordsville, in Ohio county, Ky., and its branches, as now constructed, to Hardinsburg and Falls of Rough. It is alleged that under an arrangement between the railway company and the Central Trust Company, trustee in the deed of February 1, 1887, there were reserved 370 of the bonds secured by said deed of trust; that none of said bonds were issued until long after the year 1891, and all were unissued at the time said contract was entered into between said defendant railway company and said McCracken; that "whatever may be the right of any holder of bonds issued prior to the passage of the mechanic's lien law, under which the interveners are claiming, the interveners say that in no event could the holders of these 370 bonds, or any of them, claim priority to these interveners, but are subject thereto."

This intervening petition is demurred to by the trust company, and several grounds presented, but the only ones which have been argued by counsel are those which raise the question of the finality of the chief engineer's estimates, and the priority of the lien of interveners to the holders of the 370 bonds. It is insisted for the trust company that, by the terms of the contract between McCracken and the interveners, the final estimate is conclusive between the parties, and that no other or different amount can be recovered. We think it is true, under the authorities, that where the parties contract for the conclusiveness of the estimate of a chief engineer, or other person, under a contract, both parties are bound, unless there is fraud or such a mistake in the estimate as would show a want of good faith in the party making the estimate. See Kihlberg v. U. S., 97 U. S. 398; Sweeney v. U. S., 109 U. S. 618, 3 Sup. Ct. 344; Railroad Co. v. March, 114 U. S. 549, 5 Sup. Ct. 1035; Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290. It must be conceded in this case, however, that there is no express agreement to make the chief engineer's final estimate conclusive. It is, however, insisted

that the conclusiveness of his estimate is necessarily implied from the terms of the contract. The provisions of the contract are:

"When the work is completed and accepted, there shall be a final estimate made by the engineer, of the quantity, character, and value of the work, agreeably to the terms of this contract; and the balance, after deducting the several monthly payments, and upon the contractor's giving a release to the parties of the second part for all claims and demands whatsoever, will be paid in full."

I do not see that this is an agreement that this estimate of the engineer is to be conclusive. The court should not imply such an agreement, but should require clear and express language, because it is contracting away the right of the party to appeal to the courts of justice in case of a controversy. It was at one time seriously contended that the conclusiveness of a contract making a party the arbitrator, in instances like this, was against public policy, and would not be permitted; but now, as it seems from the foregoing cases, it is settled that such a contract can be made between the parties, and will be enforced. In the case of Railroad Co. v. Wilcox, 48 Pa. St. 161, the contract was:

"It is mutually agreed and understood that the chief engineer of said railroad company shall estimate the work done by Wilcox on said sections, and under said contract, up to the first day of March, 1859; and, when said estimate to be made by the terms of the contract shall be reported, the balance due to said Wilcox, if any, after proper adjustment of his accounts with said company, shall be paid to him as provided for in said contract."

It was insisted in that case that the estimate of the engineer was final, and conclusive upon the parties, but the court held otherwise. Thompson, J., said:

"The first and second assignments of error present the same question, and that is whether the estimates of the chief engineer are to be considered conclusive, precluding all other testimony on the same subject-matter, unless fraud or bad faith be shown on his part. The case of Navigation Co. v. Fenlon, 4 Watts & S. 205, and succeeding cases, among which are * * *, in which the estimates and decisions of the company's engineers, in case of disputes between the contractors and the company, were held to be conclusive, all rest on a positive stipulation in the contract to that effect; and even the validity of the express stipulation was hotly contested in the first-mentioned case [Navigation Co. v. Fenlon], because it was urged that it was a provision by which the company was enabled to choose its own judge, and one that was directly interested, to sustain their quarrel. To this it was answered that such an objection was waived by the stipulation, and that it was even competent for a contractor to agree to the arbitrament of an interested party, if he chose, and when, with full knowledge, he did so, he must abide the result. The subsequent cases were all ruled by the decision in this case. In this contract, however, this stipulation for finality is wanting, and this makes a most material difference. It provides for monthly estimates, and in the end for a final estimate, by the engineer, without any declaration as to conclusiveness. His estimates and acts, therefore, have no quality of an adjudication. It must depend for finality upon its inherent accuracy, and, to test whether it be accurate or not, it is liable to be met by any competent proof which may disclose its errors and mistakes, if there be any."

See, also, Sherman v. Mayor, etc., 1 N. Y. 321; Sloan v. Hayden, 110 Mass. 141; Roberts v. Improvement Com'rs, L. R. 5 C. P. 310; 19 Am. & Eng. Enc. Law, 875.

The case of Kihlberg v. U. S., 97 U. S. 400, may seem to be a case which does not recognize the distinction herein taken between an express agreement and an implied agreement to make estimates conclusive, or to make the judgment of a third party conclusive. In that case the provision of the contract was:

"The transportation to be paid, in all cases, according to the distance from the place of departure to that of delivery; the distance to be ascertained and fixed by the chief quartermaster for the district of New Mexico, and in no case to exceed the distance by the usual and ordinary route."

And the court held that the distance fixed under this agreement by the chief quartermaster was conclusive, even though the distance thus fixed was less than an air line. It will be observed the language is, "the distance to be ascertained and fixed by the chief quartermaster." The court say:

"The terms by which the power was conferred and the duty imposed are clear and precise, leaving no room for doubt as to the intention of the contracting parties. They seem to be susceptible of no other interpretation than that the action of the chief quartermaster, in the matter of distances, was intended to be conclusive. There is neither allegation nor proof of fraud or bad faith upon his part."

This quotation, and other language in the opinion, shows that the court construed the contract as being an express agreement as to the conclusiveness of the finding of the chief quartermaster, and also that the court had in mind the fact that it was a contract between the contractor, Kihlberg, and the United States government.

The other cases in the supreme court are all cases where the language of the contract is express as to the conclusiveness of the judgment of the parties. No question arises here as to whether or not the final estimate was a condition precedent to the contract price becoming due, because it is alleged there was a final estimate. The only question is as to the conclusiveness of such estimate.

The statute giving liens for the construction of railroads, etc., approved March 27, 1888, declares that "said lien shall be prior and superior to all other liens theretofore or thereafter created thereon." It is conceded that, as to the bonds issued before the passage of this act, it could have no effect; but it is insisted that, as to the 370 bonds not issued until after the passage of this law, to that extent it was a creation of a lien upon this railroad after the act became a law, and therefore comes within its provisions. The mortgage under which these bonds were issued was given as a substitute for a mortgage which was originally dated February 1, 1887, and was itself dated back to February 1, 1887, but executed and delivered in the fall of 1887,—some months before the passage of the law of 1888; and it may be assumed that all of the bonds mentioned (the $2,800,000 of bonds) were regularly signed by the railroad authorities, and certified by the trustee therein named, before the passage of the act. This mortgage secured equally all of the bonds issued thereunder, and so far as creating a lien is concerned, upon the record, it was completed, as to all of the bonds, prior to the passage of the act of 1888. The question then arises whether the creation of this lien, as to the 370 bonds, was before or after the passage of the act of 1888, and

within its meaning. It has been held that the legislature could constitutionally make this enactment, both as to mortgage liens thereafter and those theretofore created, if the liens were created after the passage of the act, upon the idea that all the mortgages and liens created by contract had in them, by force of the statute, the provisions of this act; it was, therefore, not impairing the obligations of contracts made after the passage of the act, and, as the limit of the lien was the contract price for the construction upon the land upon which the mortgage lien had theretofore been created, it was not taking property from a party, without his consent, by legislative authority. See Central Trust Co. v. Richmond, N. I. & B. Ry. Co.,[1] 68. Fed. 90. In Donahy v. Clapp, 12 Cush. 440, Chief Justice Shaw, in considering a claim of a subcontractor under the statute passed after the execution of the contract between the owner and the original contractor, said "that when the statute is in force, and a party does a legal act, like that of making a contract, the existing law gives force and effect to that act. He assents to, and binds himself and his property to all the legal consequences of, such act." But the court held that, as the statute giving the subcontractor a lien was not in existence when the owner contracted with the original contractor, the owner was not bound by the subsequent statute conferring liens on subcontractors. We are of the opinion, therefore, that when the lien was created of record, and when the bonds were executed and certified by the trustee, that part of the contract, at least, must have been without regard to the subsequent legislation of March, 1888, and that the mere delivery after March, 1888, did not of itself create, within the meaning of that act, a lien which could be affected by the enactment. The lien and the bonds, when delivered, took effect as of February 1, 1887. In the absence of any contract to the contrary, all of these bonds were equal in security, without regard to the time when they were issued. They were coupon bonds, bearing a close analogy to bank notes, and should be regarded as creating the lien, therefore, as of the date of the execution and delivery of the mortgage. We do not find this question distinctly presented and decided in any of the cases referred to, nor in any that we have been able to find; but the clear weight of authority is that, as between first and second mortgages or mechanics' liens, a mortgage to secure future advances—secured in the first mortgage—is superior either to the second mortgage or the subsequent mechanic's lien. This, it is true, is not absolutely in point with the case at bar, when there is an obligation to make the advances, because, in the instances named, as to advances to be thereafter made, the mortgagee had come under contractual obligations to make them; but I think there are some cases where the first mortgage has been sustained, as superior to the second mortgage, where the terms of the first mortgage are to secure advances or securityship which the first mortgagee may thereafter make, to the extent named in the mortgage, even though the mortgagee is not under contractual obligations either to make the advances, or to go

[1] 15 C. C. A. 273.

the security. In this case the lien is of record, to the limit named, and includes the 370 bonds. The courts have sustained its priority, as giving constructive notice to subsequent mortgagees or lien holders. In the case of Claflin v. Railroad Co., 8 Fed. 118, Chief Justice Waite sustained such a first 'mortgage, as against second mortgagees, and drew a distinction between railroad coupon bonds and the ordinary mortgage between man and man, saying:

"Railroad bonds are a kind of public funds. They are put on the market and dealt in as such. They are treated as current until past due, or actually retired. The mortgages provide for the security of the particular bonds they describe, and the company puts the bonds out from time to time, as occasion requires. When a dealer finds such bonds, not yet due, in the hands of the company, with the proper certificate of the mortgagee trustee upon them, it has, I think, always been understood in the commercial world that he might buy in good faith, with safety. The security has been considered a continuing one, and the bonds negotiable by the company, so as to carry the mortgage security, until they have become commercially dishonored, or something else has been done to deprive the company of its power of putting them out. In my opinion, the subsequent mortgage is not sufficient for this purpose, unless it, in terms, limits the lien of the prior mortgage to bonds actually out, and provides against reissue."

In Central Trust Co. v. Continental Iron Works, 51 N. J. Eq. 605, 28 Atl. 595, it is held:

"Mortgages for future advances operate from the time of recording, although the advances are not made until a subsequent date, and they have priority for all advances made before actual notice of subsequent incumbrances. When, between the time of the execution and recording of a mortgage and the issue of the mortgage bonds thereon, a mechanic's lien attaches to the mortgaged premises, the holders of such mortgage bonds, without actual notice of the mechanic's lien, have a lien on the mortgaged premises, relating back to the time the mortgage was recorded, prior and superior to that of the mechanic's lien."

In Reed's Appeal, 122 Pa. St. 565, 16 Atl. 100, where the liens of mortgages for advances are held superior, the distinction is drawn between mortgages to secure bonds put upon the market, and dealt in in commercial circles, and the ordinary mortgage between one man and another. The court below say:

"Where a mortgage is given to cover future advances by one man to another, it is not a matter of much inconvenience for the mortgagee to ascertain, from time to time, as he is called on for advances, whether there be intervening liens. * * * But a different case is presented where a public improvement is undertaken, requiring the expenditure of large sums of money, and the floating of a debt of great magnitude. The debt is necessarily divided into small parts, and carried into different and distant markets. It would be out of the question to ascertain the state of the record, or of the company's affairs, each time a bond was about to be sold. If this were made the duty of purchasers, it would prevent the sale of such securities altogether, or at least confine their purchase to such large concerns as could buy in bulk after due and careful inquiry. Even then the facts would be open to doubt at every subsequent sale. Thus, their value would be entirely reduced."

See, also, to the same effect, Nelson v. Railroad Co., 8 Am. Ry. Rep. 82, 88.

The question, however, now under consideration is different from that which would arise if the mortgage had been executed and de-

livered, and the statute had only given a statutory lien superior to all other liens thereafter created, and the question of priority had arisen as to some bonds issued after the creation of the lien under the statute, but which were secured by a mortgage to a trustee, executed and delivered before the creation of such statutory lien. In such a case the distinction which the cases heretofore cited draw between a mortgage to a trustee to secure coupon bonds to be thereafter issued, and the ordinary mortgage between mortgagor and mortgagee for advances that might thereafter be made, would be material. In this case the language of the statute of 1888, that the mechanic's lien therein given "shall be prior and superior to all other liens theretofore or thereafter created," has reference to the time of the creation of the mechanic's lien, and, of course, cannot include liens created before the passage of the act. The liens, therefore, which they are made prior and superior to must be liens which are created after its passage; and it is for the interveners to show that the lien claimed was after the passage of the act, else it cannot be affected by its provisions. Here an indispensable part of the creation of the mortgage lien was confessedly before the passage of the act, and therefore that lien is not within its provisions.

The opinion of Judge Hughes in Newgass v. Railroad Co., reported in 56 Fed. 676, seems to take a contrary view from that herein arrived at, but that case does not clearly show that this question was material, and it is evident that the question now under consideration was not presented and argued. Here it is incumbent upon the interveners to show affirmatively that the lien of the mortgage was created since the passage of the act of March 27, 1888. This, we think, the interveners have not done. For that reason, and for the further reason based upon the distinction between a trust deed to secure coupon bonds, and an ordinary mortgage, as between mortgagor and mortgagee, we think the demurrer must be sustained as to this allegation of the intervening petition, and it is overruled as to the other point herein decided. As to the other grounds of demurrer which have not been argued, the demurrer will be overruled pro forma.