[Civ. No. 4461.   Third Appellate District.—March 14, 1932.]

EDNA J. LANZ, Respondent, v. FIRST MORTGAGE CORPORATION (a Corporation) et al., Appellants.

Lewis Cruickshank, Gibson, Dunn & Crutcher and Norman S. Sterry for Appellants.

Newlin & Ashburn and William R. Millar for Respondent.

PRESTON, P. J.—This action was for declaratory relief and an injunction. Inasmuch as the claims of plaintiff, if established, could be fully settled by the payment of money, stipulations were entered into and approved, the effect of which was to obviate the necessity of injunctive relief.

The rights which plaintiff sought to have adjudicated involved the question of lien priority as between herself and the various defendants. The facts will develop as we proceed.

On and prior to July 15, 1923, Frank A. Powell was the owner of a certain lot or parcel of land in the county of Los Angeles, subject to certain liens. On or about that date, Powell and First Mortgage Corporation entered into a written agreement, which agreement is referred to throughout this controversy as the underwriting agreement. This agreement was in the form of a written offer by Powell and an acceptance by the First Mortgage Corporation.

The substance and effect of this agreement may here be noted. The Mortgage Corporation agrees to buy, at a ten per cent discount, $900,000 first mortgage bonds maturing at the rate of $4,000 per month for 107 months and the balance in ten years from date. These bonds are to be secured by deed of trust to Pacific Southwest Trust and Savings Bank, trustee, constituting a first lien on the lands described and on ten-story class "A" apartment building to be erected thereon, according to plans and specifications being prepared, to contain 225 apartments, more or less, and to cost

not less than the proceeds of the loan. All apartments are to be suitably furnished and the furniture to be additional security. Powell was to furnish the title policy, pay all recording fees, furnish a survey locating the building on the lot and to pay the cost of lithographing the bonds.

Powell further agreed to make all payments for materials furnished and labor performed in the erection of the building, until such time as the net proceeds of the loan shall be sufficient to complete the building, free from mechanics' liens, and to furnish a satisfactory sworn statement showing all existing contracts for the building, amount due on each, and give an estimate of the balance necessary to complete. When the First Mortgage Corporation is satisfied that the proceeds of the loan will complete the building free from mechanics' liens, it is directed to pay the net proceeds of the loan to the materialmen and contractors who furnished material and perform labor or both, in the erection of the building, upon the written order of Powell.

It is further agreed that no material shall be delivered on the ground or work done in connection with the construction of the building until after the trust deed securing the loan shall have been recorded. Each month Powell was to deposit one-twelfth of the yearly interest and option is reserved by lender to pay in multiples of $1,000 in sixty days after one year and paying three per cent bonus in amounts elected to be paid, last maturing bonds first.

Thereafter, on July 25, 1923, Powell and his wife made, executed and delivered to First Mortgage Corporation a certain deed of trust, referred to as the trust indenture. This trust indenture was dated July 15, 1923, though actually executed and acknowledged July 23, 1923, and was duly recorded in official records of Los Angeles County on July 25, 1923.

The trust indenture created a first lien upon the property to secure the payment of a $900,000 bond issue, contemplating the issuance of serial bonds, the number and terms of which are set forth in said indenture.

Contemporaneously with the execution of said trust indenture, Powell executed and delivered to First Mortgage Corporation a temporary bond in the sum of $900,000, at

which time the First Mortgage Corporation had not paid to Powell any money, nor had any money been expended by said corporation; that on or about October 1, 1923, and not before, the temporary bond was canceled and 900 serial bonds in denominations of $1,000 were executed and delivered to First Mortgage Corporation and the temporary bond was canceled.

The First Mortgage Corporation thereafter offered these bonds for sale to the public and prior to April 24, 1924, sold 250 of the bonds.

Subsequent to the making of the underwriting agreement between Powell and the First Mortgage Corporation, the said Powell organized a corporation for the purpose, among others, of erecting an apartment building upon the premises. The plan of apartment was on the so-called "Own Your Own" idea. Powell then conveyed the premises to a corporation, which was called Hollywood Own-Your-Own Company. The deed of transfer expressly conveyed subject to the lien of the $900,000 trust deed.

This Hollywood Own-Your-Own Company proceeded to sell to the public unidivided interests in the apartment building to be erected and the land occupied thereby, which undivided interests should carry the exclusive right to the use and occupancy of a given apartment or apartments, and should also carry an undivided interest in common with all other purchasers in and to the halls, basement, grounds and other portions of the property.

The claim of plaintiff herein is based upon an ownership of two of the apartments sold under the plan. These contracts are of date December 6 and December 10, 1923.

On or before April 24, 1924, but subsequent to the date of plaintiff's contracts, the contractor, who had been erecting the apartment building on the premises, abandoned the work and erection of the building was suspended because the supervising architect had refused to issue any more certificates, expressly upon the ground that the balance of the proceeds of the loan would be insufficient to complete the structure. Up to this time the First Mortgage Corporation had advanced sums totaling $453,595.13, leaving an unexpended balance of the sum of $810,000, mentioned in the underwriting agreement, amounting to $356,404.87.

Incidentally, it is again noted that there was a ten per cent discount on the $900,000 bond issue; hence, the reference to $810,000 as being the net total.

It is stipulated by the First Mortgage Corporation that the unexpended balance was known by it to be insufficient to complete the said building and at that time said corporation was the owner and holder of all of said bonds except 250 of said bonds.

On April 24, 1924, the First Mortgage Corporation entered into an agreement with one Byrnes, which agreement is referred to as the Byrnes completion agreement. This agreement provided that Byrnes would undertake to complete the building free from all liens for material or labor, that he should furnish Mortgage Corporation with copies of all bills and contracts and allow the corporation at all times free and complete inspection of everything; that out, and only out, of the balance of funds held for owner by Mortgage Corporation, the corporation will deposit to the order of Byrnes two weeks' pay-roll in the nature of a revolving fund covering two weeks in advance.

The agreement sets forth that the Mortgage Corporation is entitled to credit at that time against the bond issue for $406,345.13 on account of original discount and moneys theretofore advanced and also to accrued and accruing interest in the sum of $47,250, and that the corporation will pay the balance on the order of the owner to Byrnes in making said pay-roll, when and when only the building is completed.

The corporation agreed to withhold foreclosure of mortgages pending diligent construction and to carry the bond interest when sales of apartments have not been sufficient to liquidate such indebtedness. It is further expressly provided that the first lien of the Mortgage Corporation be always recognized as superior and that nothing in the agreement shall constitute a variance or waiver of the rights of the bondholders.

On the same date was made a declaration of trust by said Byrnes, wherein and whereby he accepts deed of premises from the Hollywood Own-Your-Own Company and declares the title in him as a trustee to perform as indicated in the agreement with the First Mortgage Corporation. The purpose of this declaration is to attest the fact that Brynes is a

trustee acting for Powell, Hollywood Own-Your-Own Company and all persons furnishing labor or materials. In other words, Byrnes was to go ahead and finish the erection of the structure. The deed from Hollywood Own-Your-Own Company to Byrnes was dated May 15, 1924, and recorded November 21, 1924.

Thereafter Byrnes did obtain the furnishing of a large amount of labor and materials, but was unable to entirely complete the building, and ceased work upon said building on or about April 15, 1925.

The persons holding the bonds formed a bondholders' committee and all of the holders of 888 bonds deposited their bonds with the committee. Of the total bonds deposited fifty-eight were deposited by First Mortgage Corporation.

In 1926 suits were commenced by lien claimants to foreclose said liens. The Mortgage Corporation and bondholders' committee cross-complained and obtained a decree to the effect that a total sum of $1,090,000 was due them and the said amount was decreed a first lien upon the property and a sale was ordered. This judgment became final. Neither plaintiff nor her assignors were parties to these suits or any of the actions.

In connection with the foregoing, it may be noted that plaintiff claims as an assignee of her parents, who were the original purchasers under the Own-Your-Own plan. No point is involved as to this feature.

And it may be stated further that one of the purposes of this present action was to enjoin the sale of the premises. However, deposit was made of sufficient moneys to satisfy any judgment that might be entered and by stipulation the sale was permitted to proceed, or, at least, that feature is out of the case.

There are other facts surrounding the sale of bonds and the failure to obtain permits from the corporation commissioner, which will be discussed hereafter.

The foregoing details of the case are sufficient to give an understanding of the controversy here. Other facts admitted or supported by evidence will from time to time appear and these will be noted in connection with the arguments which surround them.

Plaintiff's action was to secure judgment for the amount paid for the apartments as against Hollywood Own-Your-Own Company, F. A. Powell and Gilbert H. Bessemyer, the latter being an officer of the company. She asks further that the said judgment decree the bonds to be void and that plaintiff has a first lien against the property. As an alternative to the latter demand, she asks that if the bonds be declared valid, that her prior lien attach as against the fifty-eight bonds owned by First Mortgage Corporation and that such lien attach to and follow the proceeds of any foreclosure sale to the extent of the funds therefrom apportioned to the said fifty-eight bonds.

The lower court gave judgment to plaintiff in the total of $24,730.36, being principal and interest to date of judgment. The money judgment was against Hollywood Own-Your-Own Company. It was further adjudged that this amount was secured by a vendee's lien upon the real property, which lien was declared and adjudged to have been created when the Hollywood Own-Your-Own Company conveyed to Byrnes. It was decreed and adjudged that the vendee's lien thus created was and is a first and prior lien upon an undivided forty-four one hundredths interest in and to the real property and as to said forty-four one hundredths interest the vendee's lien is prior and superior to the lien of the deed of trust and the bonds secured thereby.

By way of explanation it may be stated that the forty-four one hundredths interest is arrived at with reference to the amounts advanced by the Mortgage Corporation before and after the Byrnes completion agreement. Out of the net loan of $810,000 the fifty-six one hundredths thereof was advanced prior to the Byrnes agreement and the balance thereafter.

It was the conclusion of the court below, as set forth in the findings, that all moneys paid under the Byrnes completion agreement were mere voluntary payments, not obligatory upon the lender and made at a time after the liens had ripened, which said latter liens were expressly known by the mortgagee to exist.

The main controversy in this appeal is on the question of voluntary payments. Before taking up the question, however, certain other features of the case may be noted.

The contention of respondents to the effect that the entire bond issue was void is found without merit by the trial court and the judgment was that said bonds were in all respects valid. No appeal is taken from that part of the judgment.

The appeals before us are those of the First Mortgage Corporation and the defendant grouped under the name of bondholders' committee.

All that is presented by the appeals is the question of priority of lien, although appellants do not concede the existence of any lien in favor of respondent.

The case has been exhaustively briefed, if such a term may be used, and no phase of the controversy has been left untouched. The catalog of the respective contentions would require a volume equal in size to the combined briefs. It will suffice to analyze the situation from our own viewpoint, influenced naturally by the arguments presented and the authorities cited. In so doing, we begin with the first noted transaction.

This was the offer and acceptance constituting the agreement between Powell, the owner, and First Mortgage Corporation. This is called the underwriting agreement and is dated July 15, 1923. By its terms Powell sold to the First Mortgage Corporation at a ten per cent discount the entire $900,000 bond issue. In substance and effect, however, it was not an actual sale, inasmuch as the intent of all parties was obviously that the Mortgage Corporation should act merely as selling agents in a sale to the general public. The bonds and the trust deed securing the same were issued and executed the same date and were an inseparable part of the one transaction in so far as Powell and the Mortgage Corporation were involved. The deed of trust ran to the benefit of the legal holder or holders of the bonds. The underwriting agreement is an anomaly as will more fully appear hereafter.

Powell had encumbered the property through a deed of trust to secure a bond issue for general sale. The present security was the bare lot of land unimproved, which security was in itself insufficient. The sufficiency of the security was to increase by the improvements to be made. The moneys secured through the sale of bonds were to be expended in the structure to be erected. Here was then the

purpose of the underwriting agreement. The function of the Mortgage Corporation was to receive and disburse the moneys loaned Powell. This latter company was intended as an additional safeguard for those who might purchase the bonds.

Incidentally, it might be noted that at this point in the proceedings the First Mortgage Corporation had a financial ability reflected in a $4,000 bank balance and a high sounding name.

The deed of trust securing the bonds contained no provision as to the details of the expenditures, nor did it contain any covenants binding the owner to build. The entire effect of the so-called underwriting agreement was that Powell, the owner and borrower, assigned his rights to the money received from the sale of the bonds to the First Mortgage Corporation, which latter concern was to guarantee to purchasers of bonds the disbursement of the money toward enhancing the security. For this the Mortgage Corporation was to receive a ten per cent commission from Powell. The underwriting agreement created a privity between Powell and the First Mortgage Corporation out of which resulted an active trust, the direct beneficiary being Powell, inasmuch as it was his money that would be received from the loan to him, secured by the trust deed covering his property. This underwriting agreement was, in no particular, a part of the trust deed, nor any restriction upon the bond issue or the bonds sold thereunder.

In the absence of the underwriting agreement, there was no obligation upon Powell to erect a building or to do anything else. Throughout the trust deed securing the bonds frequent mention is made of buildings on the premises or thereafter to be erected, but nowhere is there any obligation to build. The trust deed does, however, specifically declare the real estate, together with improvements to be made, subject to the terms thereof and burdened with the lien thereby created. If there had been no underwriting agreement of any sort, and Powell, through his own efforts, had been able to market the entire $900,000 of bonds to the public upon his express promise that the money so received would be expended in the completion of a building, it cannot be contended that the effect of the lien or its priority could in anywise be affected by any failure of Powell to proceed

with construction. We, of course, except a situation wherein the bondholders themselves waive priority. Both sides argue from an artificial analogy whereby the situation is made parallel to the cases wherein a deed of trust or mortgage is given to secure future advances. Appreciative of the completeness of the arguments and mindful of the sincerity and ability of counsel we do, nevertheless, deem the analogy as absent.

Whatever may have been the thought in the origin of bonds to secure payment and regardless of the idea that at the outset the theory may have been inseparable from that underlying mortgages, or other forms of security for the payment of money, it is now settled that this means of raising funds by way of loan has attained a distinct standing in the modern law.

The law, with its characteristic flexibility, not only attempts to adapt old principles to new situations, but likewise does establish new principles to meet changing conditions. And to attempt a forced adherence to some older rule, which is in no sense a rule of property, by a process which first admits the inapplicability of the former doctrine, but refuses to abandon the form while denying the principle, is but a subterfuge. In *Central Trust Co.* v. *Continental Iron Works*, 51 N. J. Eq. 605 [40 Am. St. Rep. 539, 28 Atl. 595], we find the subject again elaborated upon. Quoting from that case, we find:

"Aside from these adjudications, the bonds of corporations secured as are these bonds, are dealt with in commercial transactions, and are treated, almost without exceptions by the courts, as a class by themselves, not subject, in all respects to the stricter rules which pertain between natural persons."

In *Schroeder* v. *Berlin Arcade Real Estate Co.*, 175 Wis. 79 [184 N. W. 542, 551], a Wisconsin case, we find the subject again elaborated upon. Quoting from that case, we find:

"It will be seen from the citations and the authorities that the courts have carefully guarded and protected the interests of bondholders secured by a mortgage or trust deed and have generally and quite universally accorded them the priority which was originally contemplated by the issuance of such trust deeds or mortgages."

In *Claflin* v. *South Carolina R. Co.*, (C. C.) 8 Fed. 118, 126, the court says:

"The bonds put out, while not for circulation as money, were intended as articles of commerce, to be bought and sold in the market, and passed from hand to hand as negotiable securities. They were to be used in trade. When in the hands of the company their lien under the mortgage was suspended; but the moment they were out in the usual course of business, it again took effect as of the time the mortgage was given. Any other rule than this would materially impair the marketable value of this class of instruments and tend to defeat the very object of their execution. The whole issue of such bonds must be treated as of the date of the mortgage, without regard to the time they were actually put out, unless the contrary is clearly expressed."

In the case of *Landers-Morrison Co.* v. *Ambassador Holding Co.*, 171 Minn. 445 [53 A. L. R. 573, 214 N. W. 503–506], it is said:

"The trust deed was not given to secure a debt to the Mortgage Company, but to secure the payment of an issue of coupon bonds which were intended to be sold and were sold to the public generally. The authorities are to the effect that advances made under such a trust deed or mortgage, even if not obligatory, have priority over all encumbrances arising subsequent to the recording of the trust deed; and that the rule which applies where voluntary advances are made by the mortgagee to the mortgagor under an ordinary mortgage does not apply where the mortgage secures coupon bonds which are payable to bearer and pass by delivery and have been sold to *bona fide* purchasers. The federal courts give such bonds priority as of the date of the mortgage securing them, although other liens have attached before they were sold."

The court in *Welch* v. *Northern Bank & Trust Co.*, 100 Wash. 349 [170 Pac. 1029, 1032], after commenting upon the modern trend of bonding operations, says:

"Such transactions are made for the benefit of future investors, and it would be against the policy of the law, as it would be against natural equity, to hold that the right of a bondholder attached at the time he pays his money for the bonds, and not from the time the trust deed was

made, and the bonds issued and certified by the Trust Company.''

Innumerable decisions may be cited from many jurisdictions affirming the same doctrine.

We conclude, therefore, that from the date of the trust deed in the instant case the premises involved were impressed with a lien to secure the payment of the entire bond issue, and that the date of sale of the bond becomes immaterial. And the trust deed covered not only the land described, but also any improvements thereon at the time, together with any additional structures, buildings or other additions thereto. A lien having attached, its effect or priority could be lost either by satisfaction of the debt or obligation upon which the lien rested or by waiver. It is not contended here that there was either. We then find the premises here considered burdened with the lien of the trust deed. The owner Powell transferred this land to Hollywood Own-Your-Own Company, expressly subject to this lien. Still no question arises as to priority.

We now come to the entry of the plaintiff into the picture. When plaintiff purchased the apartments under the own-your-own plan, the agreement of sale, signed by plaintiff, contained this express notice: ''The buyer understands that the seller has borrowed the sum of Nine Hundred Thousand Dollars, the net proceeds of which loan shall be used exclusively in the construction of said building and the cost of this enterprise as a whole and a mortgage or Deed of Trust covering the premises and building to be constructed thereon has been given as security for the payment of said loan, the time of payment of said loan to extend over a period of ten years.'' And not only is the mortgage or trust deed recognized, but provision is made for the payment of the bonds by the purchasers of the apartments.

From these provisions two features of the case are developed: First, it is manifest that plaintiff took her interest with full knowledge of and in subordination to the lien of the mortgage and trust deed; second, that whatever notice, actual or constructive, chargeable to the Mortgage Corporation or the bondholders included notice of plaintiff's said acknowledgment. At this point, assuming the bonds extant, it is clear that plaintiff could have no claim of lien prior to that of the bondholders.

At the time of plaintiff's contracts, the building had been started, the foundations were in, and some height had been attained, the record failing to disclose the exact stage of erection. Thereafter, building progressed and in the course thereof the First Mortgage Corporation had advanced a total of $453,595.13. At this point the work of construction ceased and it was known to said Mortgage Corporation that the remainder of the net bond issue was entirely insufficient to complete the building.

Here we meet again the original underwriting agreement. This agreement was between Powell and the First Mortgage Corporation. It could in nowise affect the trust deed or the obligations thereby secured. In fact, the very essence of the agreement contemplated the sale of the bonds, inasmuch as there was no other source from which moneys could be obtained. This underwriting agreement was primarily for the protection of the First Mortgage Corporation and particularly so in view of the fact that Powell, the owner, was without resources individually, and also for the reason that it was then understood that the proceeds of the loan would complete the proposed building. The First Mortgage Corporation had no right of control over any of the funds, save and except as such right and power was vested in it by Powell. The status of the Mortgage Corporation was that of a disburser of funds borrowed by Powell. Irrespective of the terms of the agreement, the parties thereto had the reserved right to alter the terms thereof at any time and if the alteration was harmful to the rights of the bond purchaser the latter would have such remedies as the law makes available. While this agreement was for the benefit of the owner, Powell, yet also was the control of the funds and the disbursement thereof for the benefit of the First Mortgage Corporation. The latter was to market the bonds to the public and the salability of the bonds depended upon the security behind them. For this service the Mortgage Corporation was to receive a ten per cent bonus or profit and guaranteed to the bondholders the erection of the improvements and protection accorded thereby. If it chose to weaken or destroy this guaranty, as it obviously did, this was a matter between the company and the bondholder, but in no sense a waiver of any right by the purchasers of the bonds.

The agreement stipulated that when the Mortgage Corporation was satisfied that the proceeds of the loan would complete the building it was directed to pay the net proceeds to the materialmen and contractors furnishing material and labor on the building, upon the written order of Powell. The advancement of the proceeds of the loan began at once and the trial court impliedly finds these were not merely voluntary advances, inasmuch as the entire theory of the judgment restricts the voluntary advances to those made at a time when it became manifest that the proceeds of the loan would not complete the building.

To repeat, the parties to the agreement, being Powell and the Mortgage Corporation, by their own conduct determined that the funds should be applied immediately when available and written orders were given by Powell for their disbursement. There is no dispute that these funds went into the property. After the sum of over $450,000 had been expended it was then, for the first time as far as the record discloses, that it became evident that the balance would not complete the building and the said building was then five stories up. It was then, according to the theory of respondent and the apparent theory of the judgment, that the Mortgage Corporation and the bondholders should abandon the building, lose the $450,000 as far as the security of the premises assured it, and thereby effect the saving of the remainder, which saving would represent a salvage of one-half.

We have now the so-called Byrnes completion agreement. It will be noted that in this agreement there was no requirement that the $356,000 complete the building, nor was that the intention of the parties. In the course of construction up to this point there had accrued many unpaid claims for labor and material, which claims were admittedly subject to the trust deed securing the bonds. As the situation stood, no one could realize on the unfinished building. Therefore, the owners deeded to Byrnes as a trustee for the creditors, including specifically the bondholders, the purpose of the trust being the completion of the building. Thereupon Byrnes, with the full consent and authorization of the creditors, entered into the completion agreement. The lien of the mortgage in its full amount was specifically recognized and the entire transaction acknowledged the

priority of this lien. Byrnes thereupon undertook to complete the building and in this endeavor the Mortgage Corporation advanced the remaining $356,000, plus the additional amount comprising the balance of the loan.

■ The finding of the trial court and the judgment following determined all advances under the Byrnes completion agreement to have been voluntary advances and not within the protection of the original lien as against intervening liens accrued. This conclusion is based entirely upon the assumption that the entire transaction, with reference to the bond issue, was that of a mortgage to secure future advances. It may be conceded that where a mortgage secures future advancements, it is necessary that such advancements be made pursuant to the requirements of the mortgage and that if made without the said requirements and with actual notice of intervening liens, the priority claimed under the mortgage will not prevail. As we have heretofore indicated, we do not consider the present transaction as one to secure future advancements. The authorities cited establish the proposition that the trust deed or mortgage securing a future bond issue attaches for the full amount as of the date thereof and each subsequent bond relates back automatically and completely to the instrument creating the indebtedness. By this conclusion we take the question of voluntary advancement out of the case entirely. It being apparent that the disposition of the moneys by the borrower can in nowise affect the obligation to repay or the security behind said obligation, it follows that, in the absence of some controlling equity, the lien of the mortgage or trust deed could not be affected by an unwise expenditure. (*Landers-Morrison Co.* v. *Ambassador Holding Co.*, 171 Minn. 445 [53 A. L. R. 573, 214 N. W. 503–506].)

As the situation presents itself, upon analysis, it parallels a condition where the owner had borrowed outright upon the security of his land the sum of $900,000 and had deposited that money in a bank or other depositary upon an agreement between himself and the depositary that the money would be expended only when a contemplated building would be completed with the funds deposited. It could not be successfully contended that the advancement to the owner of these funds before the happening of the condi-

tioned event would affect the lien of the original loan. In the instant case, as we have pointed out, there was no privity between the bondholders and the First Mortgage Corporation other than that created by the guaranty of the Corporation to complete the building. If this guaranty created a privity, then it must follow that the expenditure of the moneys received was obligatory, beyond question, regardless of how far it might complete the building, for the reason that any deficiency was to be advanced or made good by the guarantor.

And further it is to be noted, that the mortgage and trust deed securing the bond issue created a first lien upon the land and all improvements thereon or thereafter to be erected or made. For the purposes of full discussion, however, we may accept respondent's theory to the extent that the rule of law applicable to future advancements under a mortgage governs the instant case.

It is the settled law of this state that to cut off the lien of a voluntary advancement made under a prior mortgage, the mortgagee must have actual, and not constructive, notice of the subsequent encumbrance. In the case of voluntary advancements, the lien of the mortgage cannot be enforced as against subsequent encumbrances, of which the mortgagee has actual notice, for advancements or indorsements made or given after such notice. The notice must be *actual*. Constructive notice by the recording of subsequent encumbrances is not enough. (*Tapia* v. *Demartini*, 77 Cal. 383–387 [11 Am. St. Rep. 288, 19 Pac. 641]; *Savings & Loan Soc.* v. *Burnett*, 106 Cal. 514–532 [39 Pac. 922]; *Atkinson* v. *Foote*, 44 Cal. App. 149–159 [186 Pac. 831]; 17 Cal. Jur. 897–900.)

The fact is found and undisputed that First Mortgage Corporation did have actual notice of the contract between plaintiff and Hollywood Own-Your-Own Company. What notice was given by this contract? Obviously, the contract itself answers the query. Notice was given that Hollywood Own-Your-Own Company had agreed with plaintiff to erect and construct a building and that plaintiff had agreed to purchase certain apartments therein; that the plaintiff understood and agreed that the full sum of $900,000, secured by the deed of trust or mortgage was a lien prior to his contract and took the contract subject thereto. And

further that the contract itself set up a means whereby plaintiff should, as a condition of his full ownership, discharge the lien of the mortgage or trust deed. This contract between the Own-Your-Own Company and plaintiff not only subordinated the right of plaintiff to the lien of the mortgage and assumed a discharge thereof but went further. It provided that the net proceeds of the loan should be used exclusively in the construction of the building and the enterprise as a whole.

So, therefore, even under the rule of future advancements under a mortgage, the mortgagee here, if so treated, would have no actual notice sufficient to deny his lien for advancements, even if voluntary, as against any lien arising from the contract noticed. Throughout the discussion, we have assumed the existence of a lien in favor of plaintiff. This assumption may be accepted as well founded, notwithstanding the arguments advanced to the contrary. But in every lien and indispensable thereto is an object upon which it may fasten. Lien and obligation are inseparable and the only obligation here is that created by Hollywood Own-Your-Own Company and fastened upon the premises and the buildings to be thereon placed. The mere act of the Own-Your-Own Company could create no greater lien than could an absolute transfer by it, in the absence of some act or waiver or forfeiture chargeable to prior lienholders. The lien is in the nature of a proceeding *in rem* whereby the specific property to which the contract relates becomes answerable for its performance. And where, as here, the specific property exists only as subjected to recognized prior liens and encumbrances, the lien is limited to this property thus and as chargeable.

We conclude, therefore, that from the nature of the transaction the advancements made do not come within the rule of payments made under a prior mortgage; that the same were not voluntary advancements; and lastly, that if they might be so considered, they were made without actual knowledge of a prior or intervening *encumbrance*.

On this conclusion, the judgment of the court below must be modified.

Many other points presented become unnecessary to determine.

Respondent, however, insists that we should again consider the question of the validity of the entire bond issue upon his contention that all the bonds are void and of no effect. The argument is that no permit was ever obtained from the commissioner of corporations. It is not necessary to detail the argument or the facts upon which it rests. This question was passed upon by the trial court and there is no appeal from that portion of the judgment decreeing the bond valid. We may add, however, that we do not hold that the door of inquiry is closed on that account alone. It is not at all inconceivable that the court, *sua sponte,* might, upon a complete showing, declare the entire bond issue of no effect if issued without authority. However, no such showing is made to justify action of that character by the court.

There is a dispute of fact as to some of the essentials going to constitute the claimed illegality.

The point urged is mainly as to an intent to get around the future demands and requirements of the law. In other words, it is conceded that at the time of the execution of the trust deed and issuance of the temporary bond, one single bond, there was no illegality connected with the proceeding. However, between this time and the actual issuance and sale of the separate bonds, the law, previously enacted, became operative, which required the permit of the corporation commissioner. Evidence was adduced, though denied to some extent, that the scheme of issuing a temporary bond and the plan of issuing serial bonds later was with the intent to evade the provisions of this (since demonstrated in this case) most salutary statute. Even that is not persuasive. Our scheme of legislative demands, excepting in emergency measures, a period of time to elapse between enactment and effect and in the zone between the situation remains unchanged, and acts done and performed are governed by the law as it then exists, rather than the law as it will be at some future time. The motive which implies a lawful act is immaterial.

We further conclude, without comment, from the record before us that the plea of laches and limitation are not supported. Such likewise was the finding of the trial court. ▇ There remains one other matter to be determined. We have seen that the relationship created under a bond

issue between the bondholders and the property and all third persons is one of exception from the general rules of negotiable instruments. On grounds of public policy and economic expediency a peculiar safeguard is thrown about the bond purchaser and his title and rights are the objects of tender solicitude. Yet, this distinction does require *bona fides* and fair dealing. It is not entirely the welfare of the bondholder that is involved, but likewise the security of public finance and investment. One holding a bond, transferable merely by delivery, is not immune from all of the demands of equity and conscience, regardless of all other considerations and purely by reason of the fact that he holds a bond issued for sale to the general public.

The trial court found, upon sufficient evidence, that there were 106 bonds deposited with the bondholders' committee, the holders and owners of which were not holders for value and without notice, but who took and held with full knowledge of all of the facts and conditions surrounding the negotiations and the results, and who either directly or constructively participated throughout in the entire transactions.

These bondholders and the number of bonds owned by each appear as follows:

First Mortgage Corporation............ 58 bonds
W. B. Hiett......................... 28 bonds
Guardian Investment Company......... 20 bonds

The facts found are but perfunctorily questioned and it is needless to exhaustively detail them.

The spirit of the rule of exceptions, as hereinbefore referred to, is wholly equitable though in part an economic safeguard.

The unfortunate jumble is directly traceable to the activities of the First Mortgage Corporation. The high-sounding guarantee of the practically penniless corporation, its delinquency in affording the protection to all of the bondholders, which was well within its power, its wilful and ruinous laxity in disbursing the funds acquired after full notice, all combine to take from it the protection given one who is blameless. It took these bonds as its private venture and from the outset was in closest privity with the owner Powell, and with him actively brought about the situation

from which it would now claim the benefit, exempt from the consequence of its own act.

The judgment of the trial court is modified to provide for a decree giving plaintiff a vendee's lien upon the premises, subject to the prior lien of the bondholders, but providing further that this lien of plaintiff attaches to the 106 bonds listed and that from any fund impounded in the court below or from the funds derived from any sale of the premises under foreclosure, or other sale, to satisfy the lien of the trust deed, the lien of plaintiff to attach to such portion of such funds as proportionately represents the share otherwise due and payable to the owners of the said 106 bonds. As thus modified the judgment is affirmed.

Plummer, J., and Thompson (R. L.), J., concurred.