[Civ. No. 11533. Second Appellate District, Division One.—November 15, 1938.]

WILLIAM S. BARKER et al., Respondents, v. WILLIAM H. ACKERS et al., Defendants; H. H. MORGAN et al., Appellants.

' Warren E. Libby, Libby & Sherwin, Call & Murphey and Guy T. Graves for Appellants.

Gibson, Dunn & Crutcher, J. C. MacFarland and George D. Jagels for Respondents.

WHITE, J.—This action was commenced January 9, 1933, by the plaintiffs as members of a committee of noteholders allegedly owning and holding $666,000 principal sum of the Pickwick Corporation 6½% Collateral Trust Gold Notes (hereinafter referred to as the "notes"), against defendants

as individual stockholders in the Pickwick Corporation (hereinafter referred to as the "corporation"), to recover from the defendants on their stockholders' liability.

For a clear understanding of the issues it is necessary to epitomize the facts, from which it appears that on December 13, 1929, the directors of the corporation adopted a resolution increasing its bonded indebtedness by $1,000,000 and calling a meeting of the stockholders for December 26, 1929, to consider and pass upon such increase. On December 18, 1929, the corporation entered into a contract with its bankers, M. H. Lewis & Co., Banks-Huntley & Co., and America Investment Co., reading in part as follows (emphasis added):

" . . .

"1. The Company will immediately create an issue of One Million Dollars ($1,000,000.) of Six and One-half Per cent Collateral Trust Gold Notes (hereinafter called the 'Notes'), *to be secured by a collateral trust indenture in form and terms satisfactory to the Bankers.* Said notes shall be dated December 15th, 1929, and Five Hundred Thousand Dollars ($500,000.) thereof shall mature December 15th, 1931, and the remaining Five Hundred Thousand Dollars ($500,000.) thereof shall mature December 15th, 1932. All of the notes shall be in the denomination of One Thousand Dollars ($1,000.) each, numbered from 1 to 1,000, both inclusive, and shall bear semi-annual interest coupons calling for the payment of interest on June 15th and December 15th of each year.

" . . .

"7. *Subject to the fulfillment of the conditions of this agreement and of this paragraph,* the Bankers agree to purchase from the Company, and the Company agrees to sell to the Bankers, Seven Hundred Fifty Thousand Dollars ($750,-000.) of said notes at the price of ninety-four per cent (94%) of the par value and accrued interest from the date of the notes to the date of delivery, for the notes due in 1931, and at the price of ninety-three and one-half per cent (93½%) of the par value of the notes and accrued interest from their date to the date of delivery, for the notes due in 1932. The purchase of said notes by the Bankers shall be subject to the fulfillment of the following conditions:

"(a) The issuance of the notes and the trust indenture securing the same shall be satisfactory to the Bankers as to terms, and all legal proceedings and steps incident to the creation of said notes, the increase of bonded indebtedness, the form of said notes, the trust indenture, and all of the proceedings with reference to the authorization and issuance of said notes, shall be subject to the approval of Messrs. Gibson, Dunn & Crutcher, attorneys for the Bankers.

"(b) Permit of the Corporation Commissioner of the State of California, authorizing the sale of said notes to the Bankers at and for the price of ninety-three and one-half per cent (93½%) of their par value, plus accrued interest from their date to the date of delivery, of the notes due in 1932, and at ninety-four per cent (94%) of their par value plus accrued interest from their date to the date of delivery, of the notes due in 1931.

"(c) Furnishing of balance sheets and earnings statements showing financial conditions satisfactory to the Bankers of the Company and its subsidiaries, and also of Motor Transit Corporation, Pacific Transportation Securities, Inc., and Pickwick Greyhound Lines, Inc.

"(d) *Pro forma* balance sheet, prepared by the Company's accountants, showing the condition of the Company after giving effect to this financing.

"   . . .

"9. If requested to do so by the Bankers, the Company agrees to secure a negotiation permit from the Corporation Commissioner of the State of California, authorizing the negotiation for the sale of said notes on the prices and conditions herein set forth.

"   . . .

"13. *Upon the fulfillment of the conditions precedent to the purchase of the notes,* and upon forty-eight (48) hours notice from the Company that said notes are ready for delivery, the Bankers agree to take up and pay for Three Hundred Seventy-Five Thousand Dollars ($375,000.) of said notes, fifty per cent (50%) thereof being of the 1931 maturity, and fifty per cent (50%) thereof being of the 1932 maturity. The Bankers shall take up and pay for the remaining Three Hundred Seventy-Five Thousand Dollars ($375,000.) of said notes, fifty per cent (50%) thereof being of the 1931 maturity, and fifty per cent (50%) thereof being of the 1932 maturity, at any time on or before February 1st, 1930.

"14. It is understood that said notes shall be delivered to the Bankers on or before February 1st, 1930, and in the event they shall not be so ready for delivery to the Bankers before said date, the Bankers shall have the exclusive option, but shall not be so obligated, at any time within ninety (90) days thereafter to purchase of the Company, subject to the terms hereof, all of said notes at the prices herein set forth.

"15. In consideration for the purchase by the Bankers of said notes, the Company agrees to give the Bankers the exclusive option at all times up to the maturity date of said notes to purchase the remaining Two Hundred Fifty Thousand Dollars ($250,000.) of said notes when, as and if issued by the Company *subject to the approval of the issuance thereof by counsel for the Bankers,* at the same prices agreed to be paid hereunder for the 1931 and for the 1932 maturities respectively.

" . . .

"20. The interest of each of the Bankers in said notes is one-third, and each of said Bankers shall be liable to take up but one-third of said notes when, as and if the conditions of this agreement shall be fulfilled."

On December 26, 1929, the stockholders in meeting assembled authorized the issuance of the notes and authorized and directed the officers and directors of the corporation to take all necessary steps to complete the same.

On December 28, 1929, the corporation delivered to the trustee two copies of the indenture executed by the corporation, all of the notes with coupons attached executed by the corporation, and a copy of the permit of the commissioner of corporations permitting the issuance of the notes. At the same time the corporation authorized the delivery to the bankers of $750,000 principal sum of the notes at the prices specified in the agreement, while on December 30 the corporation delivered to the trustee the collateral to secure the aforesaid $750,000 issue of notes in accordance with the terms of the indenture. On the same day the trustees certified to all of the notes and on the day following executed the trust indenture.

Thereafter, on January 8, 1930, an opinion of the attorneys for the bankers was delivered to the trustee, and the indenture was recorded by the latter on January 9, 1930.

Delivery of the notes to the bankers was made for their convenience in ten instalments of varying amounts, the first on January 9, 1930, and the final instalment on March 21, 1930.

Interest payments on the notes were made regularly by the corporation until December 15, 1931, when default was made in the payment of interest due on that date and on $242,000 principal sum of the notes maturing on that date.

On January 28, 1932, the corporation went into a federal equity receivership, and on February 10, 1932, the United States District Court for the Southern District of California, Central Division, limited the time for the presentation and filing of claims with the receiver to June 20, 1932. The plaintiffs herein did not present or file any claim under this order upon the notes owned by them, but on September 25, 1934, they caused the trustee to sell all the collateral held in pledge by the trustee under the indenture and accepted $305,867.16 as their share of the proceeds of the sale. Of this amount, $163,965.50 was applied to the payment of principal on the $666,000 worth of bonds held by plaintiffs.

Thereafter the plaintiffs petitioned the United States District Court for authority to file a belated claim against the corporation, which petition was denied. Pending appeal from this order, and on September 26, 1935, the plaintiffs signed a proposed plan of reorganization of the Pickwick Corporation to settle in full their claim against the corporation by accepting their *pro rata* proportion of 8,000 shares of the common capital stock of Western Terminal Company.

On August 24, 1935, a proceeding under section 77b of the Bankruptcy Act was commenced for reorganization of the corporation, and in this proceeding the amended plan of reorganization was approved by order of the federal court on February 4, 1936. By this order the plaintiffs were perpetually enjoined from prosecuting any action or claim against the corporation held by or through or under the notes, or any of them. The amended plan of reorganization signed by plaintiffs was consummated and carried out in the federal proceeding, resulting in an order discharging the reorganization trustee.

Following trial of this action in 1936, judgment was rendered against the appellants for their *pro rata* proportion of the indebtedness against them as stockholders of the corporation, found by the trial court to exist in favor of

plaintiffs after the allowance of credit by reason of the aforesaid trustee's sale and the credit found by the court to exist by reason of the acceptance of the Western Terminal Company stock under the reorganization plan. From that judgment, as well as from an order denying their motion for a new trial and their motion to vacate the judgment, two separate groups of defendants each prosecute an appeal, which appeals by stipulation were consolidated and are heard upon one clerk's and reporter's transcript.

Appellants' first ground of appeal is that this action is barred by the special statute of limitations applying in the case of stockholders' liability suits and provided for in section 359 of the Code of Civil Procedure, it being contended that the action was commenced January 9, 1933, a date more than three years after "the liability was created".

The liability, if any, of the appellants herein is a liability created by law within the meaning of section 359 of the Code of Civil Procedure, pursuant to and in accordance with the provisions of the Constitution upon stockholders' liability, section 3 of article XII as it existed prior to its repeal by vote of the people on November 4, 1930, and which was in effect at the times pertinent to the issues here presented and which contained the following language: "Each stockholder of a corporation or joint-stock association, shall be individually and personally liable for such proportion of all its debts and liabilities contracted or incurred, during the time he was a stockholder, as the amount of stock or shares owned by him bears to the whole of the subscribed capital stock or shares of the corporation or association. . . . " See, also, section 322 of the Civil Code, as it existed prior to its repeal in 1931. An action upon this primary and independent liability must be brought within the time specified in section 359 of the Code of Civil Procedure, i. e., within three years after the liability was created. Of course there is a clear and wide distinction between the creation of a liability and the accruing of a cause of action thereon; and section 359, *ex industria,* emphasizes that distinction. A liability may be absolute or contingent; it may be unconditional or limited; it may be presently enforceable by action, or there may be time given for its performance; but whatever its character, it is created by the consummation of the contract, act or omission by which the liability is incurred. (*Chambers* v. *Farnham,* 182 Cal. 191 [187 Pac. 732].) This has been re-

peatedly approved and is settled law in this state. (*Gardiner* v. *Royer,* 167 Cal. 238, 240 [139 Pac. 75], and cases there cited.) That such is the law is not disputed by counsel on this appeal. The question to which appellants devote their argument is as to *when* the liability of Pickwick Corporation in respect to the matter here involved was contracted or incurred, for admittedly the liability of the then stockholders sprang into existence at the very moment of the contracting or incurring of the liability by the corporation—in other words was ''created'' at that very moment—and was barred by the provisions of section 359 of the Code of Civil Procedure upon the expiration of three years therefrom without action instituted against the stockholders.

It was determined by the trial court that this liability was contracted and incurred upon the respective dates when the corporation's 6½ per cent collateral trust gold notes were sold to the bankers and were paid for by the bankers, the earliest date of any such sale and payment being January 9, 1930. January 8, 1933, the day before the date upon which this action was commenced, was a Sunday, and therefore it is conceded that for the purpose of the statute of limitations it may be assumed that this action was commenced on January 8, 1933. (*Tilden Lumber Co.* v. *Perino,* 2 Cal. App. (2d) 133 [37 Pac. (2d) 466].) No contention is made by appellants that this action is barred if the liability upon which the suit was brought was incurred on or after January 9, 1930. It is the claim of appellants, however, that the statute of limitations began to run on either of the following dates: (1) December 18, 1929, the date of the signing and execution of the original agreement between the corporation and the bankers; or (2) December 31, 1929, the date upon which the trust indenture was signed and acknowledged, and prior to which all of the notes were certified.

We find no merit in the contention of appellants that the liability was created by the agreement of December 18, 1929. This agreement was executory in character. It merely provided that should the corporation perform certain acts, viz., secure the approval of the commissioner of corporations to the issuance of the notes, and should the proceedings obtain the approval of the bankers' counsel, etc., then the bankers would, upon delivery of the notes, receive and pay for the same. Appellants rely upon such cases as *Hunt* v. *Ward,* 99 Cal. 612 [34 Pac. 335, 37 Am. St. Rep. 87], *Coulter Dry*

*Goods Co.* v. *Wentworth,* 171 Cal. 500 [153 Pac. 939], *Chambers* v. *Farnham, supra,* and *Pidgeon* v. *San Diego C. Brewing Co.,* 47 Cal. App. 676 [190 Pac. 1048], but in each of these cases the agreement in question which gave rise to the liability was an unconditional promise, to pay money, construct a dam, deliver goods and merchandise, or the like. In the instant case the agreement of December 18, 1929, was completely performed when the notes were delivered to the bankers and payment therefor received by the corporation on January 9, 1930. This is not an action for breach of the December 18th agreement as that was fully performed. In the case before us, whether the corporation should ever become liable depended upon its ability to perform the conditions precedent contained in the contract of December 18th. After the performance of those conditions such contract was extinguished, and the corporation's liability was then imposed by reason of the delivery of its notes to the buyers thereof and receipt of the consideration therefor.

The corporation incurred no liability upon the notes unless it was able to comply with the conditions precedent. In other words, no debt or liability was incurred by the corporation until it had issued and delivered the notes. (*Finch* v. *Finch,* 68 Cal. App. 72 [228 Pac. 553]; *Yule* v. *Bishop,* 133 Cal. 574 [62 Pac. 68, 65 Pac. 1094]. See, also, *Stevens* v. *Weisbaum,* 87 Cal. App. 664 [262 Pac. 762]; *H. K. McCann Co.* v. *Denny,* 205 Cal. 147 [270 Pac. 190]; *Kempton* v. *Floribel Land & Imp. Co.,* 46 Cal. App. 456 [189 Pac. 478]; *Bridges* v. *Fisk,* 53 Cal. App. 117 [200 Pac. 71]; *Ryland* v. *Commercial & Sav. Bank of San Jose,* 127 Cal. 525 [59 Pac. 989]; *Wills* v. *Woolner,* 21 Cal. App. 528 [132 Pac. 283]; *Comeau* v. *Keene,* 209 Cal. 256 [286 Pac. 1038]; *Wass* v. *Keene,* 209 Cal. 263, 266 [286 Pac. 1041]; *Unruh* v. *Kauffman,* 205 Cal. 238 [270 Pac. 440].)

In the case before us the stockholders are sought to be held liable upon the debt of the corporation arising out of an issue of its notes. When did this debt arise? Until the notes were actually issued there certainly was no liability upon the stockholders. The liability upon the agreement of December 18th is immaterial; that agreement is not in question here, as this suit was not brought thereon. It was fully performed. It is not the first time that parties enter into an agreement that determines when the liability arises; it is the time that

172

the agreement results in an unconditional obligation. (*Stevens* v. *Weisbaum, supra.*)

Appellants' second contention with reference to the statute of limitations, that the stockholders' liability was created on December 31, 1929, when, according to appellants, "the corporation had completed its acknowledgments and deliveries and made the notes conclusively binding upon it", is equally without merit; because the trial court found that the trust indenture securing the notes and stock certificates under the trust indenture were placed in escrow, the conditions of which were not fulfilled until January 8, 1930, and that delivery of the trust indenture and of such collateral was not accomplished until January 8, 1930; and the evidence amply supports such findings. If the liability was incurred January 8, 1930, of course the action is not barred. Further, the acts of the corporation last above mentioned constituted merely preliminary steps taken to authorize the issuance of the notes. Taken as such steps were to authorize the issuance of the notes and to set up the trust indenture for the securing thereof, these steps in no way created a liability, and certainly the corporation was not impressed with the liability to pay the 6½ per cent collateral trust gold notes until the actual issuance and delivery of the same on January 9, 1930. (*Wass* v. *Keene, supra; Yule* v. *Bishop, supra.*) We hold that the obligation here in question did not arise until the issuance, that is to say, the delivery by the corporation of the notes and the receipt by the corporation of a valuable consideration therefor; and that occurred January 9, 1930. The cases of *Lanz* v. *First Mortgage Corp.,* 121 Cal. App. 587 [9 Pac. (2d) 316], *Claflin* v. *South Carolina R. Co.,* 8 Fed. 118, 126, and *Wachner* v. *Richardson,* 14 Cal. App. (2d) 422 [58 Pac. (2d) 714], have no application here, because this is not one of those cases in which the date of issuance of the notes operates retrospectively as of the date of the execution or recordation of the trust indenture. (*Germania Trust Co.* v. *San Francisco,* 128 Cal. 589, 593 [61 Pac. 178].)

Appellants' next claim, that independent of the notes, the terms of the trust indenture claimed by appellants to have been executed and delivered as of December 31, 1929, created a promise to pay which started the statute of limitations running, falls before the well supported finding of the trial court that the trust indenture was not delivered until Janu-

ary 8, 1930, and our conclusion previously expressed that the liability was not impressed until delivery of the notes and receipt of the consideration therefor.

It is next argued that certain findings are in truth not findings at all, but conclusions of law. These have to do with the finding by the court that the liability first arose at the time of the issuance, sale and delivery of the notes, and that until such issuance, sale and delivery, the corporation was not subject to "said indebtedness or liability in whole or in part"; and the finding that "the causes of action alleged.in plaintiffs' complaint are not barred by section 359 of the Code of Civil Procedure or by subdivision 1 of section 338 or by section 335 of the Code of Civil Procedure of the State of California". Whatever criticism may be made of the phraseology used in these findings, we cannot say that appellants were prejudiced thereby, especially in view of the fact that the holdings find ample support both in the evidence and the law applicable thereto. Complaint is next made that finding XV, as to the total number of shares of stock outstanding and the respective number of shares held by each of appellant shareholders issued and outstanding between January 7, 1930, and March 22, 1930, the period during which all of the notes upon which this action is based were issued by the corporation, is not supported by admissible or competent evidence. It would unduly prolong this opinion to here set forth in detail the evidence in support of this finding. Suffice it to say that we have read the record and conclude that the finding is supported by competent and legal evidence, both oral and documentary. Where certain stock records kept by the Bank of America as transfer agent did not constitute primary evidence a proper foundation was laid for the introduction of transcripts thereof when the loss of the originals was proved. The books of the company were competent evidence to prove the number of shares subscribed for and issued at the time the alleged liability arose, and also to prove who were the shareholders.

Next appellants urge that because respondents as a noteholders' protective committee agreed to a plan of reorganization of the debtor corporation under section 77b of the Bankruptcy Act of 1898 as amended, they have lost their right to proceed against appellants in this action. Section 77b of the Bankruptcy Act (11 U. S. C. A., sec. 207), subdivision "a", sets up the machinery wherein and whereby

corporations, whether or not they have been adjudicated a bankrupt, or their creditors, may commence a proceeding to effect a plan of reorganization. Subdivision ''b'' provides that a plan of reorganization must fulfill certain requirements. Subdivision ''c'' outlines the powers of the court, and in subdivision ''e'' the statute provides: ''A plan of reorganization shall not be confirmed until it has been accepted in writing . . . and such acceptance shall have been filed in the proceeding by or on behalf of creditors holding two thirds in amount of the claims of each class whose claims have been allowed and would be affected by the plan. . . . ''

Subdivision ''f'' provides for a hearing and consideration upon the plan by the court and directs that the judge shall confirm the plan upon being able to make certain findings as to its adoption and fairness. Subdivision ''g'' provides that upon confirmation the provisions of the plan and of the order of confirmation shall be binding upon the debtor and all creditors. Subdivision ''h'' provides that upon final confirmation of the plan, ''the property dealt with by the plan . . . shall be free and clear of all claims of the debtor, its stockholders and creditors, except such as may consistently with the provisions of the plan be reserved in the order confirming the plan. . . . '' Subdivision ''h'' further provides that ''upon the termination of the proceedings a final decree shall be entered discharging the trustee or trustees, if any, making such provisions as may be equitable, by way of injunction or otherwise, and closing the case. Such final decree shall discharge the debtor from its debts and liabilities, and shall terminate and end all rights and interests of its stockholders except as provided in the plan or as may be reserved as aforesaid. . . . '' Subdivision ''k'' provides that in the event a plan of reorganization cannot be adopted and consummated, then the court may order a liquidation, and the ordinary provisions of the Bankruptcy Act become operative.

It is appellants' claim that a plan of reorganization pursuant to section 77b of the Bankruptcy Act, when confirmed by the court, is not distinguishable in principle from what is known in bankruptcy proceedings as a composition with creditors. It is true, as claimed by appellants, that no adjudication in bankruptcy was ever made in the case at bar, nor was any discharge in bankruptcy ever applied for or issued. Undoubtedly there is a distinction between a dis-

charge in bankruptcy and a composition settlement, as well as between the consequences which flow therefrom. A composition with creditors partakes of the nature of a contract, in a measure superseding and outside of the bankruptcy proceedings; it is an offer and acceptance, and the respective rights of the bankrupt and the creditors are fixed by the terms of the offer upon its confirmation. But that does not mean that the stockholders' liability is modified every time the corporation finds itself in financial difficulties, because to so hold would be to make the stockholders' liability nominal only. The very purpose of the stockholders' liability and the only value in it is the protection it affords when the debtor corporation itself is unable to meet its obligations. It must be noted also that there is a difference between a common-law composition and a composition in bankruptcy. In the former the creditors voluntarily release the principal debtor and therefore release codebtors, while in the case of a bankruptcy composition the discharge is by operation of law and not by act of the creditor who assents to the composition. Upon the institution, as in the instant case, of proceedings for corporate reorganization under section 77b of the Bankruptcy Act, the creditor is forced to cooperate in the proceedings for a composition or a corporate reorganization, for whether or not he appears or consents to a composition or corporate reorganization, the bankrupt or debtor, as the case may be, may be discharged. The creditor is without choice but to attempt to obtain or assent to the composition or plan of reorganization which he deems the most favorable. For this reason, undoubtedly, it has been repeatedly held that a composition in bankruptcy in no way discharges the codebtor, whether or not he consents to the composition. (*In re Kornbluth,* 65 Fed. (2d) 400, 402; *Myers* v. *International Trust Co.,* 273 U. S. 380 [47 Sup. Ct. 372, 71 L. Ed. 692]; *Easton Furniture Mfg. Co.* v. *Caminez,* 146 App. Div. 436 [131 N. Y. Supp. 157]; *Guild* v. *Butler,* 122 Mass. 498, 500 [23 Am. Rep. 378]; *In re American Paper Co.,* 255 Fed. 121; *Pacific Bank* v. *Michaelson,* 216 App. Div. 120 [214 N. Y. Supp. 715]; *Blomberg* v. *Self,* 16 Ala. App. 627, 628 [80 So. 631]; *Mason & Hamlin Organ Co.* v. *Bancroft,* 1 Abb. N. C. (N. Y.) 415; *First Nat. Bank* v. *Wood,* 53 Vt. 491, 496; *A. Klipstein & Co.* v. *Lipschitz,* 130 Misc. 291 [223 N. Y. Supp. 822].)

Where, as in the case before us, neither the plan of reorganization nor its confirmation provided in express terms

that the same should be in full satisfaction of the obligation of stockholders under their liability, we hold that the shareholders were not released from their liability as such. As was said in *Myers* v. *International Trust Co.*, 273 U. S. 380, 383, 384 [47 Sup. Ct. 372, 71 L. Ed. 692], "It also results, from the very nature of a composition, that where the terms offered and accepted go merely to the discharge of the maker of a note, its confirmation does not release an indorser from his separate liability for which no 'bargain' was made. . . . " (Citing cases.) ▮ Further, the Bankruptcy Act itself provides, "The bankruptcy of a corporation shall not release its officers, . . . directors, or stockholders, as such, from any liability under the laws of a state or of the United States," and subdivision "k" of section 77b of the Bankruptcy Act, under which the reorganization here admittedly was made, provides that the sections of the Bankruptcy Act applicable to bankruptcy shall be applicable to proceedings in reorganization under section 77b. That the aforesaid rule of the Bankruptcy Act providing that the bankruptcy of a corporation or association shall not release its officers, directors or stockholders as such from any liability under the laws of a state, should apply to proceedings in reorganization under section 77b seems meet and proper, because no reason for a difference exists. Going merely to the discharge of the debtor corporation, the confirmation of the plan of reorganization did not release the stockholders as such from their separate liability.

No other points require discussion or consideration.

▮ The appeals from the orders denying motions to vacate the judgment are dismissed, for the reason that under the settled law of this state an appeal will not lie from such order if the grounds upon which the moving party sought to have the judgment vacated existed before the entry of judgment and were available on appeal from the judgment. (*Lawson* v. *Guild*, 215 Cal. 378, 380 [10 Pac. (2d) 459]; *Barry* v. *Learner*, 113 Cal. App. 651 [299 Pac. 82].) Not having been furnished either with a copy of the grounds of such motions to vacate the judgment, nor with argument thereon, we cannot assume that such motions were appropriately and properly made, nor can we review the same on this appeal.

■ The purported appeals from the orders denying the motions for new trial are dismissed, for the reason that no such appeal is authorized by law under the facts and circumstances here present.

For the reasons herein stated, the judgment from which these appeals are taken is affirmed.

York, P. J., concurred.

DORAN, J., Dissenting.—I am in accord with the views expressed and the conclusions reached in the prevailing opinion, except as to those phases pertaining to the statute of limitations. As to that portion thereof, I dissent. In that regard, summarizing the events briefly, it will be remembered that the directors of the corporation adopted the resolution to create the debt on December 13, 1929. On December 15th, the indenture and security for the loan was deposited with the trustee. On December 18, 1929, the contract was executed between the corporation and the bankers, by the terms of which the corporation agreed to sell and the bank agreed to buy the notes which represented the debt created by the above-mentioned resolution of December 13th. On December 26th the stockholders approved and ratified the action of the board of directors. Thereafter the notes, which were dated December 15th, were delivered by the corporation to the bankers and the consideration received by the corporation therefor.

It is my opinion that, for the purpose of determining when the statute of limitations commenced to run, the prevailing opinion attributes erroneous legal effect to the act of the corporation in issuing the notes, as well as to the time when the same were issued, and to the contract of December 18th, between the corporation and the bankers.

The liability of the stockholders for the debts of the corporation was statutory and arose by operation of law when the debt was created by the corporation. On December 13th the corporation duly resolved to increase its debt by $1,000,-000. All action taken by the corporation thereafter was the product of this resolution and, in my opinion, when such action was completed, it followed as a matter of law that so far as the liability of the stockholders for the debts of the corporation was concerned, that liability attached as of December 13th. The contract of December 18th was merely a

step in the process by which the loan, representing the debt, was obtained. The issuing of and the delivery of the notes was another step by which the money, representing the loan, was obtained. Neither act had any legal effect upon the action of the corporation in resolving to create the debt in the first instance.

Although the contract of December 18th determined the duties and liabilities of the parties thereto, and as well vested the rights of the parties to the contract as of that day, nevertheless neither such contract nor the date of the execution thereof determined when the statute of limitations commenced to run against the personal liability of the stockholders. That contract merely provided in effect that, subject to the fulfillment of certain conditions, the corporation bound itself to borrow and the bankers bound themselves to lend the amount representing the debt the corporation had theretofore resolved to create. Nor, in my opinion, did the physical issuing of the notes representing the debt by the corporation have any bearing on such question. This act on the part of the corporation, in my judgment, was merely clerical. The execution of the contract and the issuing of the notes were merely the mechanics of the process of performing the practical details necessarily required to complete the transaction and thereby accomplish the purpose of the resolution of December 13th.

There was but one debt and that debt was created but once. It is true that the liability of the corporation in that connection was contingent upon the performance of certain acts and the fulfillment of certain conditions. But the performance of those acts and the fulfillment of those conditions subsequent, when complete, merely concluded the process. They in no sense fixed the time of the creation of the corporation debt.

The prevailing opinion in effect relies upon the argument that as long as the notes were not issued and delivered and the money received therefor, there was no corporation liability; therefore, the notes having been issued in ten different instalments, the statute of limitations commenced to run at ten different times. If this argument is sound, then, carried to its logical conclusion, there were ten different debts created at ten different times. It is my opinion that the notes were evidence of but one debt and that their issue in

instalments is only incidental and of no legal consequence or effect whatever as to the issue herein considered.

It may be conceded, as argued in support of the prevailing opinion, that if the notes had not been issued there would have been no liability, but it is just as logical to assert that if the corporation had never adopted the first resolution, there would have been no liability. The fact remains that the notes were issued, and from the standpoint of logic it is but idle speculation to give consideration to that which does not exist. Such argument is regarded as beside the issue.

The notes refer the holders thereof to the indenture of December 15, 1929, for a description of the rights of the bearers thereof, and further provide as follows: "Reference is made to the indenture to all of the terms and provisions of which indenture the holder thereof, by acceptance of this note, assents." There is nothing either in said indenture, the minutes of the resolutions of the directors or stockholders or in the agreement of December 18th, which provides in substance or effect that the corporation debt shall not accrue until the notes are issued and delivered. To the contrary, as heretofore noted, the notes bore date of December 15th and the bankers agreed to buy the notes for 94 per cent of the par value and accrued interest from the date of the notes to the date of delivery.

The reasoning upon which the prevailing opinion is based, if my understanding thereof is correct, is in substance to the effect that there was no liability of the corporation to pay any amount until the notes were issued, delivered and the consideration received therefor. Hence there could be no liability of the stockholders until that time. The flaw in such argument, in my judgment, results from taking into account the time the incident occurred, when the incident alone is material. It must be remembered that the question herein under consideration deals with the liability of the stockholders for the debt of the corporation and the time when that liability accrued. The stockholders, by subsequent approval, authorized only the debt created by the resolution of December 13th. The notes are dated December 15th and it must be assumed that the corporation executed them on that date. Questions as to when the liability might have become enforceable against the corporation are beside the issue.

California Jurisprudence notes the following: "The liability of a stockholder being one created by law, the statute

runs three years after the creation of that liability, and not three years from the time the liability becomes enforceable against the corporation,—that is, the liability of the stockholder accrues at the inception of the corporation's liability, and the statute commences to run from that date. Under the statute a 'liability' is created when a contract binding on it is made by the corporation, independently of whether the liability is absolute or contingent or of when the right to enforce it may accrue. Of course, the liability of the corporation and that of the stockholders may become enforceable at the same time. . . . '' (6 Cal. Jur., p. 1014.) As pointed out in the prevailing opinion, there is a distinction between the creation of a liability and the accruing of a cause of action thereon. And, as further noted in California Jurisprudence, ''The effect of this rule, together with the fact that the liability of the corporation and that of the stockholder are separate and distinct with different periods of limitation in most cases, is that a stockholder may be liable for his proportion of a debt of the corporation even after the cause of action against the corporation itself is barred; and the statute of limitations may have run against the stockholders' liability before it has run against the corporation, or even before it has accrued against the corporation.'' (6 Cal. Jur., *supra*.)

Based upon a different premise, there is one other conclusion which may be reached. Assuming that the resolution of December 13th, in legal effect, was merely a proposal to create the debt, then that proposal ripened into a debt when the contract of December 18th was executed, for beyond question that contract, having been fully performed, created the relation of debtor and creditor as of the date of its execution.

For the foregoing reasons, in my opinion, the judgment should be reversed.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 12, 1939.